STATE OF NORTH CAROLINA v. DAVID EARL LOCKLEAR

No. 79

(Filed 31 January 1977)

**1. Criminal Law § 73— testimony by locksmith — no hearsay**

In a first degree murder prosecution, testimony by a locksmith as to his making of a key for a vehicle like that used for the getaway vehicle was not hearsay, since the locksmith testified only as to what he did and what he saw another person do.

**2. Criminal Law § 73— identification testimony — no hearsay**

Testimony of a murder victim's wife identifying a codefendant by name was not hearsay, though the witness admitted that she did not know the codefendant's name prior to her husband's death; moreover, even if the testimony was hearsay, defendant was not prejudiced by its admission, since the testimony placed no new material before the jury.

**3. Attorney and Client § 4; Criminal Law § 82— attorney as notary public — testimony as to validity of signature — no error**

Where the validity of defendant's signatures on two documents was called into question by defendant's testimony, defendant was not prejudiced when the State called as a witness one of defendant's attorneys who had notarized one of the documents allegedly signed by defendant, since the attorney was not called upon to testify concerning confidential attorney-client matters, but was instead called upon to testify as to the authenticity of defendant's signature.

**4. Criminal Law § 102— district attorney's jury argument — propriety**

In a first degree murder case the trial court did not err in allowing the district attorney in his jury argument (1) to explain

State v. Locklear

that the felony-murder rule applied in this case and that defendant was either guilty of first degree murder or not guilty at all; (2) to wave a pair of handcuffs in front of the jury and argue what torture could be inflicted upon a person while handcuffed; (3) to state to the jury that the defendant should have produced a certain witness, since such statement answered an argument raised by defendant; and (4) to state that defendant and his cohorts were the "lowest of crooks that you can find in this community."

5. **Constitutional Law 36; Homicide § 31— first degree murder — life sentence substituted for death penalty**
   A sentence of life imprisonment is substituted for the death penalty imposed in this first degree murder prosecution.

APPEAL by defendant pursuant to G.S. 7A-27(a) from the judgment entered by *McLelland, J.,* at the September 1975 Session of ROBESON Superior Court.

Defendant was tried and convicted upon an indictment, proper in form, for the murder of Hudler Hunt, and sentence of death was imposed.

The State introduced evidence tending to show that approximately four months prior to January 1975, defendant and Larry Clark were informed by Adolph Stewart that Hudler Hunt of Rowland, North Carolina, was known to carry large sums of cash on his person. Stewart showed defendant and Clark where Mr. Hunt lived and stated that Mr. Hunt would be "easy to rob."

Thereafter, on 20 January 1975, defendant, Larry Clark and one Mike Peplinski, after discussing and planning the robbery earlier that day, traveled to Mr. Hunt's house in a yellow station wagon. Upon arriving there at approximately 6:30 p.m., Clark and Peplinski went to the back door of the house and stated that Peplinski was employed by the Department of Corrections and needed to use the phone to report an escaped prisoner. Peplinski went into the house and used the phone, leaving Mr. Hunt and Clark outside beneath the carport. Mrs. Hunt became suspicious and started to walk outside to see her husband. At this time, Peplinski sprayed Mrs. Hunt with some form of tear gas. As Mrs. Hunt turned away from the gas, she heard several shots being fired in the vicinity of her husband. She also heard Peplinski ask Clark, "Did you get his pocketbook?" and Clark respond, "Hell no, I'm shot, let's get out of here." Mrs. Hunt went inside and grabbed her rifle and fired

at Clark and Peplinski sixteen times. Mr. Hunt was found dead in the area beneath the carport.

Defendant, throughout this time, was in the station wagon. When he saw Mrs. Hunt open fire with her rifle, he attempted to move the vehicle, but backed into a ditch and fled on foot.

Clark was found dead in a field close to the Hunt house. He had a pistol in his hand. By expert ballistics testimony, the pistol was identified as the weapon which fired the bullets that killed Mr. Hunt. The next afternoon, defendant was located in a swamp approximately four miles from the Hunt residence. The State introduced a statement, purportedly signed by defendant, which related facts essentially the same as those outlined above.

Defendant took the stand and testified that he knew nothing of the plans to rob Mr. Hunt. Rather, he was under the impression that Mr. Hunt was indebted to Clark and that the men were going to Hunt's house to collect the debt. He stated that when the shooting began, he backed the car into a ditch and then fled on foot. Defendant further testified that he did not sign the statement introduced by the State as his confession; that the signature appearing thereon was a forgery; and that the facts contained therein were lies.

Other facts necessary to the decision of this case will be discussed in the opinion.

*Note:* Mike Peplinski was tried and convicted of first degree murder for his participation in the shooting of Mr. Hunt. His conviction was affirmed in *State v. Peplinski,* 290 N.C. 236, 225 S.E. 2d 568 (1976).

*Attorney General Rufus L. Edmisten by Assistant Attorney General James Wallace, Jr. for the State.*

*John U. McManus and J. H. Barrington, Jr. for defendant appellant.*

MOORE, Justice.

[1]   Defendant first contends that the testimony of Bobby Ray Jackson was hearsay and prejudicial. Jackson, a locksmith, testified that he made a key for a 1973 yellow station wagon located in a parking lot adjacent to the Hide-A-Way Lounge in

State v. Locklear

Fayetteville, North Carolina. He further testified that he then gave the key to a girl behind the counter at the Hide-A-Way Lounge. The girl paid him and signed an authorization for the making of the key in the name of Mike Peplinski. " 'Evidence, oral or written, is called "hearsay" when its probative force depends in whole or in part upon the competency and credibility of some person other than the witness by whom it is sought to produce it.' " *King v. Bynum,* 137 N.C. 491, 495, 49 S.E. 955, 956 (1905). *See also* 1 Stansbury, North Carolina Evidence § 138 (Brandis rev. 1973) ; *State v. Peplinski,* 290 N.C. 236, 225 S.E. 2d 568 (1976) ; *State v. Deck,* 285 N.C. 209, 203 S.E. 2d 830 (1974). In instant case, the locksmith only testified as to what he did, or what he saw the girl in the Hide-A-Way Lounge do. This is not hearsay.

[2] Defendant also contends that the testimony of Naomi Hunt, identifying a codefendant as Michael Peplinski, was hearsay. At trial, she identified Peplinski as a white man who came to her house on the night in question, and she identified him by the name of Michael Peplinski. She admitted that she had not known the name of this defendant prior to the date of the murder of her husband. Defendant contends that she could only have acquired the name of Peplinski by hearsay evidence.

Assuming, for the purposes of argument, that the testimony of Mrs. Hunt referred to above was hearsay, it was not sufficiently prejudicial to warrant a new trial. Defendant, both in his statement to officers and his testimony at trial, stated that Peplinski was one of the men involved in the Hunt murder and was present at the Hunt home on the night of the shooting. Accordingly, Mrs. Hunt's identification did not place any new material before the jury and was not prejudicial. This assignment is overruled.

[3] At trial, the State introduced into evidence a statement which implicated defendant in the murder of Mr. Hunt. Deputy Sheriff Hubert Stone testified that defendant made the statement and that defendant signed the statement in Stone's presence. Defendant, however, testified that he could not read or write, that he did not sign the statement, and that he had never seen the statement before. Defendant further testified that he did not sign the affidavit in support of a motion to suppress evidence filed in the case on his behalf. The signature appearing on the affidavit was "David Locklear" and the affidavit had

been notarized by John U. McManus, Jr.—one of defendant's attorneys.

During the presentation of the State's rebuttal evidence, Mr. McManus was called as a witness. The trial judge expressly limited the scope of any testimony Mr. McManus might give to "his official function in relation to the execution of a paper which is a document in the court file in this case, but only to that extent." Thereafter, Mr. McManus testified that he was a notary public; that he had notarized the affidavit in support of defendant's motion to suppress; and that "[t]he person that signed this affidavit signed it in my presence." The district attorney then asked, "All right. Whose signature appears on that document?" Upon objection by Mr. McManus to this question, the district attorney withdrew him as a witness.

Defendant contends that prejudicial error was committed simply by permitting defense counsel to be called to the witness stand. For this proposition, he cites *State v. Sullivan*, 373 P. 2d 474 (Wash. 1962). In *Sullivan*, defense counsel was called to testify regarding matters which were clearly privileged under the attorney-client relationship. The Washington Supreme Court held that this was prejudicial error since the only motive for calling defense counsel to testify regarding privileged matters was to prejudice defendant before the jury. In instant case, defense counsel was not called as a witness to testify as to any matters within the attorney-client privilege. Rather, counsel was called upon to verify a signature signed in his presence while acting as a notary public. The validity of defendant's signatures had been called into question by defendant's testimony and it is obvious that the State was attempting to rebut defendant's evidence that the signatures were forgeries.

We find another case, also from the State of Washington, which is strikingly similar to the case at bar. In *State v. All-good*, 313 P. 2d 695 (Wash. 1957), defendant was on trial for forgery and his handwriting was required to be proved. To facilitate this proof, defense counsel, who had notarized an affidavit bearing defendant's name and purported signature, was called as a witness for the State and was permitted to identify defendant's signature. The court found no error in the admission of this testimony and affirmed defendant's conviction. *See also State v. Manning*, 291 A. 2d 750 (Conn. 1971); *State v. Crissman*, 287 N.E. 2d 642 (Ohio App. 1971); *State v.*

*Stiltner,* 377 P. 2d 252 (Wash. 1962) ; *People v. Boford,* 256 P. 2d 334 (Cal. App. 1953).

Confidential communications made to an attorney in his professional capacity by his client are privileged. The attorney cannot be compelled to testify to them unless his client consents, "[b]ut the mere fact the evidence relates to communications between attorney and client alone does not require its exclusion. Only confidential communications are protected. If it appears by extraneous evidence or from the nature of a transaction or communication that they were not regarded as confidential, 58 A.J. 274, or that they were made for the purpose of being conveyed by the attorney to others, they are stripped of the idea of a confidential disclosure and are not privileged. [Citations omitted.]" *Dobias v. White,* 240 N.C. 680, 684-85, 83 S.E. 2d 785, 788 (1954). *See State v. Van Landingham,* 283 N.C. 589, 197 S.E. 2d 539 (1973) ; 1 Stansbury, North Carolina Evidence § 62 (Brandis rev. 1973).

In present case, defendant's attorney, as a notary, witnessed the signing of the affidavit by defendant. This was for the purpose of enabling the notary, if necessary, to testify as to the authenticity of defendant's signature. Hence, it was not a communication which was regarded as being confidential between attorney and client, and no privilege attached to the notarization. Further, we do not feel, under the facts of this case, that defendant was prejudiced by his attorney being called as a witness. Accordingly, this assignment is overruled.

Defendant next assigns as error certain portions of the district attorney's argument to the jury. In this jurisdiction, counsel must be allowed wide latitude in the argument of hotly contested cases. He may argue the facts in evidence and all reasonable inferences to be drawn therefrom, together with the relevant law, so as to present his case. *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976) ; *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975) ; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974). Ordinarily, an impropriety in the argument should be brought to the attention of the trial court in time for the impropriety to be corrected in the charge. After verdict, an objection to argument comes too late. *State v. Noell, supra; State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970). The argument of counsel must ordinarily be left to the sound discretion of the judge who tries the case and this Court will not

review his discretion unless it is apparent that the impropriety of counsel was gross and well calculated to prejudice the jury. *State v. Noell, supra.* Under G.S. 84-14, counsel may argue to the jury "the whole case as well of law as of fact."

The argument, however, is not without its limitations. The trial court has the duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. *State v. Monk, supra; State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974). "If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu." State v. Monk, supra. See State v. Smith,* 240 N.C. 631, 83 S.E. 2d 656 (1954). As stated in *State v. Noell, supra,* at 696, 202 S.E. 2d at 767:

> " 'The control of the argument of the solicitor and counsel must be left largely to the discretion of the trial court, and an impropriety must be sufficiently grave to be prejudicial in order to entitle defendant to a new trial. It is only in extreme cases of abuse of the privilege of counsel, and when the trial court does not intervene or correct an impropriety, that a new trial may be allowed.' "

[4] At trial, defendant entered no objections to the district attorney's arguments, but contends that the trial court should have corrected them *ex mero motu.* Defendant first argues that the district attorney's argument went beyond the bounds of propriety in the instant case by telling the members of the jury that it was up to them to either find the defendant guilty of first degree murder or "let him walk out of the courtroom." In this portion of the argument, the district attorney was explaining that the felony-murder rule applied to the case and that defendant was either guilty of first degree murder or he was not guilty. The district attorney correctly stated the law applicable to the case. This he may properly do. *See State v. Monk, supra,* and the cases cited therein.

Defendant further contends that there was prejudicial error in allowing the district attorney to wave a pair of handcuffs in front of the jury and argue to them what torture could be inflicted upon a person while handcuffed. The evidence disclosed that the handcuffs in question were found in the car which was driven by this defendant and were introduced in evidence. The district attorney did not argue that they were actually used by

defendant, but simply as to how they could be used. The argument proved nothing and did not tend to introduce any evidence outside the record. It was a matter left to the sound discretion of the trial judge. No abuse of discretion appears. *See State v. Holbrook,* 232 N.C. 503, 61 S.E. 2d 361 (1950).

Defendant further contends that the trial court improperly allowed the district attorney to argue to the jury that defendant should have produced one Adolph Stewart to testify concerning the alleged confession of the defendant. Defendant, in his statement to the officers, stated that Adolph Stewart told him sometime before the attempted robbery that Hudler Hunt lived near Rowland with his wife, that he ordinarily carried from seven to ten thousand dollars, and that he could be easily robbed—"Just throw a gun on him and he would faint and give his money." Defendant further stated that he and Clark were shown the Hunt home by Adolph Stewart and that the men agreed to give Stewart one-half of any proceeds realized from the robbery.

In his argument, the district attorney said: "The lawyer [defense attorney] says, 'Where is Adolph Stewart? The State can get him.' You know, that man is protected in his constitutional rights. I couldn't make Adolph Stewart testify in a case wherein he's also indicted. I can't make a man testify against himself, but they have the right of subpoena. They can put him on if he wants to go on. Why, I wonder why you haven't heard from Adolph Stewart if there is nothing to do with this statement that David Earl made in this case."

In this assignment, it is apparent that the prosecutor was answering an argument made by defense counsel. Since the arguments of defense counsel were not included in the record, we are unable to ascertain the context or the inducement for the prosecutor's argument. *See State v. Monk,* 291 N.C. 37, 229 S.E. 2d 163 (1976); *State v. Taylor,* 289 N.C. 223, 221 S.E. 2d 359 (1976). However, we do not deem the prosecutor's argument to be prejudicial in light of the fact that defendant brought the issue before the jury.

The State offered Jimmy Sams, a Fugitive Sergeant of the North Carolina Department of Corrections, as a witness to identify the body of Clark. Defendant's attorney, Mr. Barrington, in his argument to the jury stated (as recited by the district attorney in his argument): "Sergeant Sams, what did he have to

do with it? Just wanted to prejudice your minds to show you that there was an escapee involved." In reply, the district attorney said:

"No, that is not true. Hubert Stone stated there was a body out in the hog pen that he did not recognize, but that he now knows to be the body of Larry Clark. I wanted to show you who that body was out there in the hog pen. And the body was removed to the morgue and Sams came in and identified it, because he knew him. How did he know him? He knew him because he was looking for him. He was the escape sergeant at McCain and had been looking for him over a period of time. That is important from two aspects. It shows you that it was in fact Larry Clark. How in the world did Hubert Stone know to include Larry Clark? He didn't even know his name at that time. So how could he include it in there? How did Hubert Stone know also if he made this up; to include the name Peplinski? You heard the evidence. Peplinski hadn't been apprehended. Nobody knew who he was. He was still out in the woods at the time David Earl was making this statement. How did the officers know to include those two names? That is why I wanted to show you what I did show you in this particular case. You follow me? Okay, Sergeant Sams said, and it is important from another reason, he is an escapee. I wanted you to know that. I think it's important to know that David Earl Locklear who was under bond at that time to start pulling a prison sentence for killing another human being, was out with an escapee from prison, hooked up with a barkeeper over in Fayetteville, making a key for an abandoned 1973 Chevrolet, going down to South Carolina, setting up some sort of sanctuary down there. I think all of those facts are important to you because you need to know what type of people you are dealing with. You are dealing with the lowest of crooks that you can find in this community. Do you believe what Sergeant Sams has to say about this case, Ladies and Gentlemen of the Jury?"

Counsel should not go beyond the testimony in a case or characterize a defendant or witnesses in a manner calculated to prejudice the jury against him. *State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667 (1962); *State v. Bowen,* 230 N.C. 710, 55 S.E. 2d 466 (1949); *State v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35 (1948); *State v. Correll,* 229 N.C. 640, 50 S.E. 2d 717

(1948). However, the district attorney may use " 'appropriate epithets which are warranted by the evidence.' " *State v. Wortham,* 287 N.C. 541, 546, 215 S.E. 2d 131, 134 (1975), wherein the district attorney's characterization of defendants as "thieves," "rogues," and "scoundrels" was held not to be improper under the evidence in that case, but very nearly so. In instant case, we do not think its use in the light of the facts shown by the record constitutes such error as to justify a new trial. The evidence introduced at trial tended to show that defendant was out on bond pending appeal of a manslaughter conviction at the time of the Hunt murder and was, at the time of trial, serving ten years in prison on the manslaughter conviction. Clark was an escapee from prison; and Peplinski had apparently appropriated a comparatively new automobile which did not belong to him. Accordingly, the district attorney must have been of the opinion that the facts of the case warranted his reference to defendant and his cohorts as "crooks."

We have carefully examined the district attorney's entire argument. Our examination discloses nothing in the argument that indicates any abuse of sound legal discretion by the trial judge and certainly no such extreme case of abuse of the privilege of counsel as to warrant a new trial. The assignments of error addressed to the prosecutor's argument are overruled.

[5] The record reveals no error in defendant's conviction of the crime of which he was charged. However, for the reasons stated in *State v. Davis,* 290 N.C. 511, 227 S.E. 2d 97 (1976), the sentence of death imposed upon defendant must be vacated and one of life imprisonment substituted therefor. Accordingly, the sentence of death is vacated and this case is remanded to the Superior Court of Robeson County with the following directions: (1) The presiding judge, without requiring the presence of defendant, shall enter a judgment imposing life imprisonment for the murder of which he has been convicted; and (2) in accordance with this judgment, the clerk of the superior court shall issue commitment in substitution for the commitment heretofore furnished. It is further ordered that the clerk furnish to defendant and his attorneys a copy of the judgment and commitment as revised in accordance with this opinion.

No error in the verdict.

Death sentence vacated; life sentence substituted.