STATE OF NORTH CAROLINA v. BOBBY LEE SMITH

No. 70

(Filed 7 March 1978)

1. **Constitutional Law § 77; Criminal Law § 75.4— defendant in custody—waiver of right to remain silent—necessity for presence of counsel**

    Defendant's contention that, at the time he made an admission, he was represented by counsel and his attorney's presence was therefore a prerequisite to a valid waiver of his rights to remain silent and to have counsel present during any custodial interrogation is without merit, since (1) on the day defendant made his statement, he was neither charged with the offense in question nor represented by counsel in this case, and (2) even had an attorney "entered the proceeding" on defendant's behalf on or before the date of the confession, which no attorney had done, defendant would have retained his right to waive counsel, the presence of the defendant's attorney not being required for waiver of counsel in this State.

2. **Criminal Law § 75.4— defendant in custody—confession—necessity for presence of counsel**

    The rule that a defendant in custody who is represented by counsel may not waive his constitutional rights in counsel's absence is not the law in this State; rather, the rule in N. C. is that in determining the admissibility of a confession by a suspect in custody, the crucial question is whether the statement was freely and understandingly made after defendant had been fully advised of his constitutional rights and had specifically waived his right to remain silent and to have counsel present.

365

State v. Smith

### 3. Criminal Law § 74.1— repudiation of confession—exclusion proper

Defendant's contention that his repudiation of his statement two hours after he gave it to police was such an integral part of the original statement as to require the admission of the repudiation along with the confession is without merit.

### 4. Criminal Law § 102.3— objection to jury argument—time for making

Ordinarily, objection to an improper argument by State's counsel must be made before the verdict so that the trial judge may be given a chance to stop the argument and instruct the jury to disregard the prejudicial material.

### 5. Criminal Law § 102.2— jury argument—control within discretion of trial court

The argument of counsel must be left largely to the control and discretion of the presiding judge; however, an exception to this rule is recognized in capital cases so that an appellate court may review the prosecution's argument in spite of counsel's laxity, but, even so, the impropriety of the argument must be gross indeed in order for the appellate court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

### 6. Criminal Law § 102.8— incriminating testimony—failure of defendant to rebut—jury argument not comment on defendant's failure to testify

The district attorney's jury argument which questioned defendant's failure to get back on the stand and deny incriminating evidence did not amount to a comment on defendant's failure to testify in violation of G.S. 8-54, since a defendant who testifies is subject to impeachment by the questions and arguments of opposing counsel, and these arguments may include comments on the defendant's failure to explain or deny incriminating evidence.

### 7. Criminal Law § 102.7— district attorney's jury argument—defendant's past criminal record summarized—no error

The district attorney did not err by summarizing for the jury defendant's extensive criminal past, since the credibility of defendant's disavowal of his confession was a crucial decision for the jury, and prior acts of misconduct including criminal convictions may be introduced in evidence to impeach the credibility of defendant.

### 8. Criminal Law § 163— jury instructions—error in recapitulation of evidence—necessity for calling court's attention to

An error by the judge in recapitulating the evidence or stating the contentions of the parties must ordinarily be brought to the judge's attention in apt time for correction in order for an objection to the error to be preserved on appeal, and it is only where the judge erroneously instructs the jury on a material fact not in evidence that the error will be held so prejudicial as to require a new trial notwithstanding defense counsel's failure to make timely objection.

**9. Homicide § 30— first degree murder—failure to submit question of guilt of lesser included offenses—no error**

The trial judge in a homicide case did not err in instructing the jury that it could return only verdicts of first degree murder or not guilty, since the State's evidence tended to show murder in the attempted perpetration of a robbery and defendant's evidence tended to show that he was never at the scene of the crime.

**10. Homicide § 23.2— proximate cause of death—jury instructions**

The trial court in a homicide case was not required to give an instruction on the issue of whether defendant killed the victim which expressly incorporated the phrase "proximate cause."

APPEAL by defendant under G.S. 7A-27(a) from the judgment imposed by *Fountain, J.*, at the 15 March 1976 Session of UNION County Superior Court. This case was docketed and argued as case No. 74 in the Fall Term, 1976.

Defendant, charged in a bill of indictment drawn under G.S. 15-144, was convicted of the first-degree murder of Jud Parker on 26 December 1975. Evidence for the State tended to show:

About 11:20 p.m. on Friday, 26 December 1975, Jud Parker, owner and operator of Jud's Restaurant in Monroe, North Carolina, returned to his home on Cherry Street after closing the restaurant. The receipts from the night's business ($800.00) were in the cash box on the front seat of the pickup truck in which he had driven home.

Mrs. Parker, hearing several shots outside her home, ran to the back door where she saw her husband scuffling with someone on the driver's side of the truck. That person had his head lowered into Parker's chest, and Parker was pushing him toward the back of the truck. When Mrs. Parker reached her husband his assailant "had broke loose" and "was jumping over the front walk." She never saw his face. As this fleeing person was crossing the walk, Parker fired two shots at him from his .32 caliber pistol. Parker then collapsed. Medical testimony disclosed that he died almost instantly from five .25 caliber gunshot wounds in the chest.

Five neighbors testified that between 11:15 p.m. and 11:30 p.m. on 26 December 1975 they heard Mrs. Parker screaming and a number of gunshots, fired in rapid succession, coming from the Parker premises. Looking toward the Parker home the neighbors

saw a man running up Cherry Street toward Riggins Street. They were able to give only a general description of the man's height and weight. Their estimates ranged from 5'6" tall and 130 pounds to 6'3" and 200 pounds. Defendant was 6'2" tall and weighed 190 pounds at the time of the trial.

Defendant Bobby Lee Smith, aged 18, moved to Union County, North Carolina, on 16 October 1975 after his release from the South Carolina Penitentiary. Smith had lived in Florida and Germany as well as South Carolina. While in Germany, at the age of 15 or 16, he had been convicted of the felony of breaking and entering a guest house. By his own statement defendant had participated in "somewhere around fifty" felonious breaking and enterings while in South Carolina. (His brother Charles estimated the number at between fifty and one hundred.) He had been taking drugs for "a good many years," having tried all kinds, including heroin. Since coming to Union County defendant had been unemployed and had committed several forgeries and one armed robbery. He had become associated with several other unemployed young people in the area, Kathy Griffin, his girl friend; his brother, Charles Smith, and his wife; Robert Spence and his girl friend, Tammy Moser. In late 1975 defendant returned to South Carolina to purchase 1000 "hits" of mescaline, a controlled substance, which he sold "in the neighborhood."

At the time of his arrest for the murder of Jud Parker on 22 January 1976, defendant was in the Union County jail awaiting trial on unrelated charges of forgery and armed robbery. On 19 January 1975, while in jail on these two charges, defendant made an inculpatory statement to the police which caused his arrest for the murder of Jud Parker. When the State sought to introduce that statement into evidence at the trial, defendant objected and a *voir dire* hearing was held. The following information was elicited at that hearing:

Early in January of 1976, but before January 17th, Attorney Larry Harrington of Monroe had represented defendant Smith as privately employed counsel at a preliminary hearing on a charge of forgery. Sometime prior to January 17th defendant had also been charged with armed robbery of one Oxner. At his bail hearing on that charge defendant had told the court that Harrington also represented him in that case. However, he had neither contacted nor retained Harrington in that matter. On Saturday, 17

January 1976, District Attorney Carroll Lowder called Harrington and informed him that "his client" Smith "wanted out of jail" and had some "valuable information" on the Jud Parker homicide, which he would exchange for his release on bail and other considerations. Lowder requested Harrington to come to the Union County jail and represent defendant in the negotiations. Harrington, who was entertaining friends and preparing to go on a bird hunt, at first declined to go, but Lowder finally prevailed upon him to come to the jail.

At the jail Harrington first saw Smith, who told him a story which vaguely implicated a man named "Rusty" in the murder of Jud Parker. In answer to Harrington's specific inquiries defendant assured him that he himself had not participated in the Parker murder and had no connection with it. Harrington testified that he was not aware that Smith was a suspect in the Parker killing and that he had hoped to achieve some reduction in Smith's sentence on the armed robbery charge in exchange for Smith's information.

Defendant told Harrington that in exchange for his information and testimony in the Parker murder case he was demanding his immediate release on bail, probation for the armed robbery charge, and the $5,000 reward which had been offered in the Parker case. Harrington told defendant his demands were "unrealistic." Nevertheless, he communicated them to Lowder, who refused to accede to them. When Harrington told defendant that the district attorney would agree to probation only after he had served five years and that the earliest he could get bail would be on Monday after the police had checked his story, "[h]e jumped up and said that he had to get out of jail on that day. . . . He said he had to go see his girl friend. He said she was pregnant, and it was vital that he get out to see her." Harrington warned defendant "it was far more important that he look down the road than to consider his immediate needs." Defendant said, "no, that he wanted to get out of jail on that day, and he wasn't going to talk to them unless he got a promise of that." Harrington told him he had other things to do and left.

Defendant's brother Charles was in jail at that time, also charged in the Oxner armed robbery. He testified substantially as follows: On the evening of 18 January 1976 he had a conversation with Sheriff Frank Fowler, Officer Kilgore, and Malcolm Niven,

the Chief of Police of Monroe. Sheriff Fowler told Charles that he would be put in a cell with his brother that night and that unless he was able to get a confession from his brother before 11:00 a.m. the next day, Charles, Kathy Griffin, and defendant would be charged with Jud Parker's murder. Thereafter Charles Smith was put in the cell with defendant and tearfully conveyed this information to him. Also in the cell with defendant and Charles at this time were Billy Devine and Gary Watkins, both of whom were serving life sentences. Both defendant and Charles testified that defendant said to his brother, "Don't worry about it, Chuck (Charles). You won't be charged with nothing." During the night defendant concocted a story which Charles wrote down. When it was submitted to Officer Kilgore he promptly rejected it as "a lie." Defendant admits that it was a fabrication.

Officer Kilgore and Sheriff Fowler each categorically denied that either Charles Smith or defendant had been told that if defendant did not confess, Charles Smith, Kathy Griffin, and defendant would all be charged with the murder of Jud Parker. In brief summary, Sheriff Fowler testified both on *voir dire* and before the jury as follows:

On Monday, 19 January 1976, a note from defendant, written by his cell mate, Gary Watkins, informed Sheriff Fowler that defendant desired to talk with him about the Parker murder. Since it was "a city case," Fowler notified Officer Kilgore, and the two officers met defendant in the jail conference room. Fowler asked defendant if he wanted to talk to him. When he said he did, Fowler orally advised defendant of his *Miranda* rights and handed him a printed waiver listing those rights. Smith read it over, said he understood his rights, and signed the waiver (State's Exhibit 10). Prior to this time Sheriff Fowler "had never interrogated this defendant at all about any matter." No inducement, threats, or pressures were brought to bear upon defendant, who appeared well and rational in all respects. After defendant signed the waiver he began pacing the floor, and the sheriff told him that if he wanted to talk "to sit down and let's talk." Defendant sat down beside the sheriff, who asked him what he had on his mind. Defendant replied, "About the Jud Parker murder." The sheriff then inquired, "What have you got that you want to tell us about the Jud Parker murder? Do you want to get yourself straight now?" Defendant responded, "I do."

Defendant then confessed to killing Parker during the course of the attempted armed robbery in December 1975. His conversation with Officers Fowler and Kilgore lasted about an hour. As defendant talked, Fowler put it in writing. When the statement was completed, defendant read it and made one correction. He said he did not want to sign it, but he did initial and date each page of the statement, which is State's Exhibit 11.

After defendant had approved the statement he asked to speak with his girl friend, Kathy Griffin. He said she was keeping 1000 hits of mescaline for him, and he would like to talk to her. The sheriff said he had no objection provided Kilgore agreed. The latter gave his permission, and the two officers went to lunch. While they were gone defendant talked to Kathy Griffin and, when the officers returned about two hours later, defendant repudiated his confession. He claimed then, and again on *voir dire* and before the jury, that the confession was but the latest in a series of fabrications he had devised in order to keep his brother and Kathy Griffin from being charged in the case. Defendant also asserted that he had believed that the statement could not be used against him so long as he did not sign his name to it.

At the conclusion of the *voir dire* hearing, the trial judge made detailed findings of fact in accordance with the State's evidence and ruled that defendant's statement was admissible in evidence. *Inter alia*, he made the following findings:

Attorney Harrington visited defendant in jail on January 17th at the request of the district attorney. At that time Harrington represented defendant only in a forgery case; he did not represent him in the pending Oxner armed robbery case. No charges had been brought against defendant in the Jud Parker murder case, and defendant had not consulted Harrington with reference to that matter.

With reference to the admissibility of defendant's statement (State's Exhibit 11), the trial judge further found: (1) Defendant, a high school graduate, had not only been warned of his constitutional rights as set out in the *Miranda* decision but he understood these rights. (2) Defendant "knowingly, freely, voluntarily, and without any promise or duress waived each of the rights assured him by the *Miranda* decision and specifically waived the right to have counsel present and the right to remain silent and signed

. . . State's Exhibit 10." (3) "[T]he only believable evidence is to the effect that the defendant was made no promise and subjected to no duress whatever" at the time he made his statement (State's Exhibit 10); that it was "freely, knowingly, understandingly, and voluntarily made." (4) Defendant, testifying in his own behalf on *voir dire*, has said that "every statement he has ever made relating to this charge as it concerns himself and others has been false; that he has been deliberately lying for the purpose of helping himself, his brother, his girl friend, either or all; that he attempted to implicate people he knew to be innocent." (5) "[T]he overall statement of the defendant and his supporting evidence is such that the court does not accept it as true where it is in conflict with the State's evidence relating to the voluntariness and competency of the statement made by the defendant to the sheriff on January 19, 1976."

In the statement, defendant said that on the night of 26 December 1975, he and Bob Spence, one of his companions, had been riding around in Charles Smith's Ford LTD. During the ride they had agreed to rob Parker. Spence let Smith out about a block from Parker's house, and Smith waited for Parker to come home. When Parker arrived Smith demanded his money. Instead of surrendering the money Parker drew his gun and fired. Smith fired back seven times or "close to it" and then ran away. Spence picked him up, and they drove to Tammy Moser's where Smith hid the car. The next day, Smith threw the gun into Lake Twitty.

At the trial, Spence denied any knowledge of or participation in the robbery. He apparently had not been charged in the matter.

The evidence for the defendant tended to show that he was not present at the home of Jud Parker at the time when he was shot and that he knew nothing of it. Evidence for the defendant further tended to show that the neighbors' descriptions given by the Parker neighbors of the man seen running from the Parker home on the night in question did not match the physical characteristics of the defendant. This evidence further tended to show discrepancies between the neighbors' accounts of the events they observed on the night of the crime and defendant's statement to the law officers.

Cell mate Gary Watkins testified at the trial that on one occasion he, defendant and Billy Devine, another inmate, were "talking about armed robberies, just stuff in general, and Billy said, 'I'd like to shake the hand of the man that had enough balls to rub out Jud Parker with a .25.' Bob jumped off the sink and said, 'Here I am' and shook hands with Billy Devine."

The court submitted the case to the jury on the theory that Jud Parker was killed by a malefactor attempting to rob him and that the jury should find defendant guilty of murder in the first degree or not guilty. Upon the verdict of murder in the first degree the judge imposed upon defendant the sentence of death, and he appealed as a matter of right to this Court.

*Rufus L. Edmisten, Attorney General, and Charles M. Hensey, Assistant Attorney General, for the State.*

*William H. Helms for defendant appellant.*

SHARP, Chief Justice.

[1] Defendant emphasizes most his assignment of error No. 11 challenging the admission in evidence of his confession, made on 19 January 1976 to Sheriff Fowler and Officer Kilgore, that he killed Jud Parker. Defendant contends that at the time he made this admission he was represented by counsel, Mr. Harrington. His attorney's presence, therefore, was a prerequisite to a valid waiver of his right to remain silent and to have counsel present during any custodial interrogation. We reject this contention and overrule assignment No. 11 on two grounds:

(1) On 19 January 1976, the day defendant made his statement to the officers, he was neither charged with murder nor represented by counsel in this case. Uncontradicted testimony tends to show—and Judge Fountain found—that on Saturday, 17 January 1976, defendant was in jail on charges of forgery and the armed robbery of Oxner. Mr. Harrington represented him in the former charge but not the latter, although defendant had falsely stated to the court at a bail hearing that Harrington represented him in the robbery case also. For reasons variously stated, defendant was determined to get out of jail that weekend in order to see his girl friend. To that end he informed the district attorney he would exchange "valuable information on the Jud

Parker case" for his release on bond and a plea bargain in his armed robbery case.

The district attorney was interested in defendant's proposition and, under the misapprehension that Harrington represented defendant on the robbery charge, he requested Harrington to come to the jail and work out the arrangements about defendant's testimony. Although most unwilling, Harrington was finally persuaded to come to the jail. When he talked to defendant he asked him specifically whether he had any part in the murder of Jud Parker. Defendant twice assured Harrington that he had not participated in the attempted robbery which resulted in the murder. He said that on the night Parker was killed "he was at a trailer out in the country, and there were three people at the trailer . . . discussing the killing."

As set out in the preliminary statement of facts the district attorney declined to bargain on defendant's terms. Harrington gave defendant some good advice about plea bargaining and left. Defendant remained in jail over the weekend, and on Monday, January 19th, he requested Sheriff Fowler to come to the jail for the specific purpose of discussing the Jud Parker murder case with him.

From the foregoing evidence it is quite clear that Mr. Harrington never represented defendant in this case.

(2) Even had Harrington "entered this proceeding" on defendant's behalf on or before January 19th—which he had not—defendant would have retained his right to waive counsel. At defendant's request Sheriff Fowler and Officer Kilgore came to the jail to talk with him. Before they talked to him, however, he specifically, knowingly, understandingly, and voluntarily exercised that right. *See State v. Thacker*, 281 N.C. 447, 189 S.E. 2d 145 (1972); *State v. Elliott*, 269 N.C. 683, 153 S.E. 2d 330 (1967); *State v. Davis*, 267 N.C. 429, 148 S.E. 2d 250 (1966).

Defendant, however, would have this Court adopt the rule first enunciated by the New York Court of Appeals in *People v. Arthur*, 22 N.Y. 2d 325, 329, 292 N.Y.S. 2d 663, 666, 239 N.E. 2d 537, 539 (1968). This rule was succinctly stated in *People v. Hobson*, 39 N.Y. 2d 479, 481, 384 N.Y.S. 2d 419, 420, 348 N.E. 2d 894, 896 (1976) as follows: "Once a lawyer has entered a criminal pro-

ceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer. . . . Any statements elicited by an agent of the State, however subtly, after a purported 'waiver' obtained without the presence or assistance of counsel, are inadmissible."

We also note that in *Hobson* the court was careful to point out that "the rule of the *Arthur* case is not an absolute. Thus, the fact that a defendant is represented by counsel in a proceeding unrelated to the charges under investigation is not sufficient to invoke the rule." 39 N.Y. 2d at 483, 384 N.Y.S. 2d at 422, 348 N.E. 2d at 897.

[2] The *Arthur* rule, that a defendant in custody who is represented by counsel may not waive his constitutional rights in counsel's absence, is not the law in this State. *See State v. Dollar*, 292 N.C. 344, 233 S.E. 2d 521 (1977); *State v. Davis*, 267 N.C. 429, 148 S.E. 2d 250 (1966). Further, as the New York Court of Appeals freely conceded in *Hobson*, 39 N.Y. 2d at 483-84, 384 N.Y.S. 2d at 422, 348 N.E. 2d at 897-98, the rule of *Arthur* extended a defendant protection under the State constitution beyond that afforded by the Federal Constitution as interpreted in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

*Miranda*, of course, held that suspects in custody must be expressly warned that they have the right to remain silent during police interrogation as well as the right to consult with counsel before and during any such questioning. In *Miranda*, however, Mr. Chief Justice Warren was careful to say, "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." The Chief Justice continued by saying that after an individual in custody had been informed of his constitutional rights in the words of the *Miranda* warning and been given an opportunity to exercise them, "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be

State v. Smith

used against him." *Id.* at 478-79, 86 S.Ct. at 1630, 16 L.Ed. 2d at 726.

Only a few courts have followed New York in holding that once an attorney has entered the case an accused cannot waive his right to counsel except in the presence of his attorney. *State v. Johns,* 185 Neb. 590, 177 N.W. 2d 580 (1970); *United States v. Thomas,* 474 F. 2d 110 (10th Cir. 1973). Other courts, including Virginia, have expressly rejected the *Arthur* doctrine. *Lamb v. Commonwealth,* 217 Va. 307, 227 S.E. 2d 737 (1976). *Accord, Moore v. Wolff,* 495 F. 2d 35 (8th Cir. 1974); *United States v. Durham,* 475 F. 2d 208 (7th Cir. 1973); *Coughlan v. United States,* 391 F. 2d 371 (9th Cir. 1968); *State v. Marks,* 113 Ariz. 71, 546 P. 2d 807 (1976); *Shouse v. State,* 231 Ga. 716, 203 S.E. 2d 537 (1974); *Commonwealth v. Yates,* 467 Pa. 362, 357 A. 2d 134 (1976).

The case of *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed. 2d 424 (1977) involved the admissibility of a confession made in the absence of Williams' attorney. In affirming the ruling of the District Court and the Court of Appeals that the confession had been erroneously admitted into evidence Mr. Justice Stewart, writing the opinion of the Court, specifically noted: "The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as we do, that he did not." *Id.* at 405-06, 97 S.Ct. at 1243, 51 L.Ed. 2d at 441. In his concurring opinion, Mr. Justice Powell expressed his view that "the opinion of the Court is explicitly clear that the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel. *Ante* at 405-406, 51 L.Ed. 2d 440." *Id.* at 413, 97 S.Ct. at 1246, 51 L.Ed. 2d at 445.

Thus, we reassert and adhere to our well-established rule that in determining the admissibility of a confession by a suspect in custody, the crucial question is whether the statement was freely and understandingly made after he had been fully advised of his constitutional rights and had specifically waived his right to remain silent and to have counsel present. *State v. Frank,* 284 N.C. 137, 200 S.E. 2d 169 (1973). Defendant's confession was properly admitted.

[3] After Sheriff Fowler was allowed to read Smith's confession to the jury, defense counsel asked him, if two hours after giving that confession, defendant had not called the statement "a bunch of lies." The district attorney's objection was sustained by the court. Fowler would have answered, "He said it wasn't true." Defendant contends that his repudiation in the afternoon was "part and parcel" of that morning's confession and that therefore it should have been admitted. We do not agree.

Moreover, were we to assume *arguendo* that labeling a statement "a bunc'. of lies" two hours after it was given to police was such an integral part of the original statement as to require the admission of the repudiation along with the confession, under the circumstances of this case the court's failure to admit evidence of this repudiation was not prejudicial error. Defendant testified that he had told Officers Fowler and Kilgore after lunch that the statement he had made that morning was a lie. Kilgore also testified that defendant had termed the confession "a bunch of lies." Where evidence of similar import to that which was improperly excluded is admitted at other times in the trial, the exclusion will not be held to be prejudicial error. *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1, *cert. den.* 386 U.S. 911, 87 S.Ct. 860, 17 L.Ed. 2d 784 (1966); *State v. Creech*, 229 N.C. 662, 51 S.E. 2d 348 (1949). Assignment of error No. 3 is, therefore, overruled.

[4, 5] Defendant's assignment of error No. 12 covers 13 exceptions to various portions of the district attorney's summation and argument to the jury, all of which were noted for the first time in the record on appeal. No objections were made at trial to any of these remarks. We have repeatedly held that ordinarily objection to an improper argument by State's counsel must be made before the verdict so that the trial judge may be given a chance to stop the argument and instruct the jury to disregard the prejudicial material. *E.g., State v. Martin*, 294 N.C. 253, 240 S.E. 2d 415 (1978); *State v. Noell*, 284 N.C. 670, 202 S.E. 2d 750 (1974). On equally numerous occasions we have also held that "the argument of counsel must be left largely to the control and discretion of the presiding judge. . . ." *State v. Stegmann*, 286 N.C. 638, 654, 213 S.E. 2d 262, 274 (1975); *State v. Westbrook*, 279 N.C. 18, 39, 181 S.E. 2d 572, 584 (1971). An exception to this rule is recognized in capital cases so that an appellate court may review the prosecution's argument in spite of counsel's laxity (*e.g., State v. Smith*,

279 N.C. 163, 181 S.E. 2d 458 (1971); *State v. Dockery*, 238 N.C. 222, 77 S.E. 2d 664 (1953). Even so, the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it. *See* 4 Strong's N.C. Index 3d, *Criminal Law* § 102.2, for an extensive compilation of the cases so holding.

We have carefully reviewed the prosecutor's arguments in this case, paying special attention to those instances to which defendant now takes exception. We find no error in these remarks, much less the gross impropriety which must exist to warrant an award of a new trial. *E.g., State v. Locklear*, 291 N.C. 598, 607, 231 S.E. 2d 256, 261-62 (1977).

[6] A few examples from the 13 exceptions will suffice to demonstrate the soundness of the prosecutor's arguments. Defendant complains in exception No. 21 that the district attorney violated G.S. 8-54 when, in his argument to the jury, he commented on defendant's failure to testify: "I'll say this to you about the statement that he made to Devine, he didn't get back on the stand to deny it, did he? . . . . If Gary Watkins was telling it wrong, why didn't he get up there and say, 'You are lying Gary.' He didn't do that." This exception is answered by the simple observation that the district attorney was inquiring why defendant did not get *back* "up there" on the stand. Defendant had already chosen to avail himself of G.S. 8-54, allowing a defendant to testify in his own behalf, when State's witness Watkins was called on rebuttal. Once a defendant testifies, therefore, he assumes the status of any other witness and is subject to impeachment by the questions and arguments of opposing counsel. *State v. Noell*, 284 N.C. 670, 695, 202 S.E. 2d 750, 766 (1974); *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971). These arguments may include comments on the witness's failure to explain or deny incriminating evidence for, if an innocent explanation exists or a denial can properly be made, the witness may reasonably be expected to provide it.

[7] The argument challenged by defendant's exception No. 27 summarized defendant's extensive criminal past. The district attorney reminded the jury that defendant had admitted dealing in a variety of drugs, committing fifty breaking and enterings in

South Carolina, and being convicted of breaking and entering in Germany. Defendant contends that the sole purpose of this argument was to appeal unfairly to the passion of the jury.

The credibility of defendant's disavowal of his confession was a crucial decision for the jury in this case. Prior acts of misconduct including criminal convictions may be introduced in evidence to impeach the credibility of a defendant. *E.g., State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222 (1976); *State v. Wright,* 282 N.C. 364, 192 S.E. 2d 818 (1972); 1 Stansbury's N.C. Evidence § 112 (Brandis rev. 1973). Since the evidence was properly admitted, the prosecutor was entitled to argue the full force of that evidence to the jury. Manifestly, the purpose of this argument was the same purpose for which the evidence was admitted — to discredit defendant in the eyes of the jury so that they would not believe his sworn testimony repudiating his pretrial confession. Notwithstanding, the district attorney never traveled outside the record, argued facts not in evidence, or placed his personal beliefs before the jury with these arguments. The exceptions, upon which defendant bases his assignment No. 12, are without merit.

[8] In assignment of error No. 13 defendant correctly argues that during his summary of the evidence and contentions of the parties the trial judge misstated one detail of defendant's testimony. The judge told the jury that defendant contended he had never been to Lake Twitty and did not know that there was a chain across the road leading to the dam. On the contrary, defendant testified on cross-examination that he had once driven near the lake and had pulled up in front of the chain. However, defendant did not bring this misstatement to the judge's attention while there was still time to correct the error before the verdict. As with jury arguments, an error by the judge in recapitulating the evidence or stating the contentions of the parties must ordinarily be brought to the judge's attention in apt time for correction in order for an objection to the error to be preserved on appeal. More than seventy decisions nf this Court are listed in 4 Strong's N.C. Index 3d, *Criminal Law* § 163 at 837, n. 27 in support of this proposition.

It is only where the judge erroneously instructs the jury on a *material fact not in evidence,* that the error will be held so prejudicial as to require a new trial notwithstanding defense counsel's failure to make timely objection. *State v. McCoy,* 236 N.C. 121, 71

S.E. 2d 921 (1952). Clearly, defendant's prior knowledge of the existence of a chain at Lake Twitty was not a material fact, and misstating the evidence in this regard could not have had any significant effect on the verdict. It is incumbent upon an appellant not only to show error but to show prejudicial error. *E.g., State v. Beal,* 199 N.C. 278, 154 S.E. 604 (1930). This assignment is overruled.

[9] Defendant's assignment No. 19 addresses the trial judge's failure to instruct the jury that it could return only verdicts of first-degree murder or not guilty, thereby eliminating the possibility of a verdict of second degree murder or manslaughter. All the evidence adduced concerning the undoubted death of Jud Parker tends to show that he was killed by an attacker who had been waiting to rob him when he returned home. Parker's assailant, therefore, is guilty of murder "committed in [an] attempt to perpetrate . . . [a] robbery," that is to say, first-degree murder. G.S. 14-17. If defendant's statement to Sheriff Fowler that he shot Parker in a thwarted attempt to rob him is believed, defendant is guilty of first-degree murder. If his testimony and that of his witness is believed, he was never at the scene of the crime and therefore could not be guilty of any degree of homicide.

In this case there exists not a scintilla of evidence to support even an inference of a degree of homicide less than first-degree murder. "[W]here no inference can fairly be deduced from the evidence of or tending to prove a murder in the second degree or manslaughter, the trial judge should instruct the jury that it is their duty to render a verdict of 'guilty of murder in the first degree,' if they are satisfied beyond a reasonable doubt, or of 'not guilty.'" *State v. Spivey,* 151 N.C. 676, 685-86, 65 S.E. 995, 999 (1909). The trial judge properly followed this injunction and instructed the jury that defendant was guilty of first-degree murder or not guilty. Defendant's assignment of error No. 19 is overruled.

[10] Defendant finally contends that the trial court erred in its instruction to the jury on the issue of whether defendant *killed* Parker. Defendant argues that an instruction which expressly incorporated the phrase "proximate cause" was required as, for example, "defendant assaulted the deceased with a deadly weapon and thereby inflicted a wound which proximately caused his death." Defendant refers us to *State v. Ramey,* 273 N.C. 325, 160

S.E. 2d 56 (1968) and *State v. Redman*, 217 N.C. 483, 8 S.E. 2d 623 (1940). To like effect are *State v. Woods*, 278 N.C. 210, 179 S.E. 2d 358 (1971) and *State v. McWilliams*, 277 N.C. 680, 178 S.E. 2d 476 (1971). We do not, however, understand these cases to create an exception to the general rule that no specific language is required to give a correct instruction, so long as the jury is properly instructed on the law bearing upon each essential element of the offense charged. 4 Strong's N.C. Index 3d, *Criminal Law* § 111.

Unlike the charge before us, in the cases cited above the jury was instructed in language which assumed that the defendant had indeed killed the deceased, thus taking this issue away from the jury's consideration. In the instant case, however, the jury was told, "*if* the defendant, with the use of a .25 caliber pistol, attempted to commit armed robbery of Jud Parker and in so doing and as a part of that transaction, *shot and killed him* . . . then the killing, under those circumstances, would have been murder in the first degree." (Emphasis added.)

From the foregoing instruction the jury must have understood clearly that before they could find defendant guilty of murder they had to find beyond a reasonable doubt that defendant both shot and thereby killed Jud Parker. Since there is not the slightest evidence to suggest that Jud Parker died otherwise than from five .25 caliber gunshot wounds inflicted by his midnight assailant, a more elaborate explanation of proximate cause was unnecessary. Indeed, any such explanation might have been confusing.

We have carefully examined other portions of the judge's charge and we can find therein no error. Defendant's assignments of error Nos. 14, 15, 16, 17, and 18 are overruled.

Defendant's remaining assignments of error involve rulings which, when viewed in context, are so obviously nonprejudicial that it is unnecessary to discuss the question of their dubious merit.

The record reveals no prejudicial error in defendant's conviction of the crime of murder in the first degree for which he was charged. However, for the reasons stated in *State v. Davis*, 290 N.C. 511, 227 S.E. 2d 97 (1976), the sentence of death imposed upon defendant must be vacated and one of life imprisonment substituted therefor. Accordingly, the sentence of death is

vacated and this case is remanded to the Superior Court of Union County with the following directions: (1) The presiding judge, without requiring the presence of defendant, shall enter a judgment imposing life imprisonment for the murder of which he has been convicted; and (2) in accordance with this judgment, the clerk of the superior court shall issue commitment in substitution for the one heretofore issued. It is further ordered that the clerk furnish to defendant and his attorney a copy of the judgment and commitment as revised in accordance with this opinion.

No error in the trial and verdict.

Death sentence vacated; life sentence substituted.