STATE OF NORTH CAROLINA v. GARY JONES

No. 584A85

(Filed 12 August 1986)

**1. Criminal Law § 30— rape—arraignment on lesser degree—no notice of intent to pursue higher degree before jeopardy attached—lesser degree binding**

The trial court erred by entering judgment of conviction for first degree rape and sentencing defendant therefor where the State made a binding election not to pursue the greater degree of the offense by unequivocally arraign-

ing the defendant on second degree rape and by failing thereafter to give any notice whatsoever of an intent to pursue a conviction for first degree rape prior to the jury being impaneled and jeopardy attaching, even though first degree was arguably supported by the short-form indictment.

**2. Criminal Law § 89.3— consistency of pretrial statements—opinion of officer who heard statements—admissible**

The trial court did not err by admitting the testimony of an officer as to the consistency of various statements made to him by a State's witness where the testimony dealt with pretrial statements rather than a pretrial statement and trial testimony and where the question in context was not posed for the purpose of corroboration but to demonstrate the reasonableness of the State's concessions in entering into a plea agreement with the witness.

**3. Criminal Law § 165— prosecutor's argument—noncapital case—no objection— review for gross impropriety**

Appellate review of a prosecutor's argument for gross impropriety in the absence of an objection at trial is not limited to capital cases, but may be invoked as well in noncapital cases.

**4. Criminal Law § 102.6— prosecutor's argument—reference to sensational event outside evidence—not grossly improper**

A prosecutor's reference in his closing argument in a trial for rape, robbery, murder and breaking and entering to a highly sensational contemporaneous event which was not a part of the evidence and his indirect reference to media coverage was inappropriate but did not require the trial court to intervene *ex mero motu*

**5. Constitutional Law § 63— death qualified jury—not unconstitutional**

Defendant was not entitled to a new trial on the grounds that death qualified juries are unconstitutional.

BEFORE *Llewellyn, J.,* at the 3 June 1985 Criminal Session of Superior Court, WAYNE County, defendant was convicted of second-degree murder, first-degree rape, common law robbery, and breaking or entering. The defendant received a sentence of fifty years on his conviction for second-degree murder. A consecutive sentence of life imprisonment was imposed for the conviction of first-degree rape. A further consecutive sentence of eight years was imposed for the conviction of breaking or entering, and a concurrent eight-year sentence was imposed for common law robbery. Defendant appeals the life sentence as a matter of right pursuant to N.C.G.S. § 7A-27(a); his motion to bypass the Court of Appeals as to the remaining convictions was allowed 15 January 1986. Heard in the Supreme Court 9 June 1986.

*Lacy H. Thornburg, Attorney General, by Marilyn R. Mudge, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Louis D. Bilionis, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

The evidence for the State tended to show that 54-year-old Mary Taper was found strangled to death in her room at the Southern Belle Motel in Mount Olive on the morning of 7 June 1984. Ms. Taper, who had worked for five years as a cook at the Southern Belle Restaurant, was the "common law wife" of Aldine Jones, the defendant's father. Ms. Taper was living at the motel while her home was being rebuilt after it was partially destroyed by a tornado.

Ms. Taper was last seen alive at 9:00 p.m. on 6 June 1984 by Ms. Daisy Westbrook, manager of the motel. When Ms. Westbrook returned from church that evening and parked her car in front of Ms. Taper's room, she observed Ms. Taper at the window closing the curtains. Shortly before that time, another employee had seen a black male wearing a cap ride up on a dark colored bicycle and park it near Ms. Taper's room.

When Ms. Taper failed to report for work at 5:30 a.m. on 7 June and did not answer her telephone, Ms. Joyce James, assistant manager of the restaurant, notified the motel manager, who met her at Ms. Taper's room. The dead bolt was not engaged, and Ms. James opened Ms. Taper's door with a key. Inside the room, they found Ms. Taper's body on the floor, her feet parted and her arms stretched above her head. The body was clothed only in a brassiere and blouse; the blouse was pulled up around the shoulders. Ms. Taper's bed appeared not to have been slept in but her pocketbook and personal items were scattered across the bed.

An autopsy conducted by Dr. Robert L. Thompson revealed extensive injuries to Ms. Taper's face and neck consistent with the victim's having been struck several times in the face with a blunt object. Dr. Thompson's opinion was that the cause of death was manual strangulation. Dr. Thompson also noted bruises and tears in the vagina consistent with forceful penetration by a foreign object. Semen was located in the vagina and on the vic-

tim's thigh. Analysis of blood, hair, and semen samples failed to "connect anyone with the crime"; none of the latent fingerprints lifted at the scene proved to be of sufficient quality for comparison.

State's witness Decarol Swinson testified that on 6 June 1984, she was sharing a bedroom in Mount Olive with the defendant, his sister Doris, her boyfriend, and Doris' child. Also living in the house were defendant's mother, grandmother, sister Renee, and Renee's four children. Ms. Swinson testified that defendant was at home during the early evening hours of 6 June but that he left at around 8:00 p.m. on a red ten-speed bicycle; he was wearing a cap. When he returned home at around 11:00 p.m., defendant was carrying a brown paper bag. He told Ms. Swinson that he wanted to talk, and she accompanied him outside to the railroad track in front of the house. The defendant told Ms. Swinson that there was money in the bag and that "him and some friend [Charles Faison] hit somebody up side the head and robbed them." The couple returned to the house and sat on the bed, where defendant counted the money—over one hundred dollars—then placed the bag of money in the bedroom loft. The next morning, 7 June 1984, the defendant told Ms. Swinson that he had strangled Ms. Taper "because she was going to tell on him."

On 4 October 1984, Ms. Swinson gave a statement to Captain Glenn Odom, describing the events of June 6 and 7. She explained that she had waited four months to make a statement because she was afraid of the defendant. When Captain Odom and two other officers arrested the defendant the next day at his home, defendant broke away and fled, but was overtaken and placed in custody.

During December 1984, defendant's second cousin, David McCullen, was confined in the same jail cell with the defendant while McCullen's cell was being painted. Pursuant to a plea agreement, McCullen, who was charged with numerous offenses unrelated to those under consideration here, agreed to testify as to the contents of statements made to him by the defendant while they were in the same jail cell. The defendant told McCullen that he and Joseph Leach had ridden bicycles to the Southern Belle Motel, that he had been there earlier in the day, that on the second occasion they hid the bicycles in the bushes, that they knocked

on Mary Taper's door and asked her about money, that Leach grabbed her around the neck and defendant hit her with his fist, that she passed out and they pulled her into the room and had sexual intercourse with her, that defendant strangled her with his hands, and that they took the money from her pocketbook and later divided it.

Defendant offered witnesses who testified that he had been at home playing cards all evening on 6 June 1984. The defendant did not take the stand.

I.

[1] Defendant first assigns as error entry of the judgment of conviction of *first-degree* rape and imposition of a life sentence therefor. The uncontroverted record indicates that Count II of the four-count indictment was captioned "Second Degree Rape" and that the judge's order for arraignment, as well as the clerk's minutes of arraignment dated 26 March 1985, list Count II of 84CRS13515 as second-degree rape. At arraignment, defendant entered a plea of "not guilty" to second-degree rape. At no time prior to or during the trial did the prosecutor indicate that the State intended to pursue a conviction for first-degree rape.

The first mention of first-degree rape appears in the transcript of a discussion among the trial judge, the prosecutor, and defense counsel after the close of all the evidence. When defense counsel argued that the evidence could at most support second-degree rape because it tended to show that the victim could have been unconscious or dead at the time the alleged rape occurred, the trial judge observed, "Well, that's all the indictment says, second degree." However, after the prosecutor proposed an instruction on first-degree rape, the trial judge denied defendant's motion "to dismiss the indictment because she was dead" at the time the rape occurred and stated, "I think I should or might consider that there was serious personal injury inflicted or[,] taking another prong of the State's evidence[,] was aided or abetted by another person, so that's denied. It's going to be sent in on first and second degree rape." The trial judge reiterated his intent during the charge conference and, indeed, charged the jury as to both degrees of the offense. The jury returned a verdict of guilty of first-degree rape, and the defendant received the mandatory

life sentence to run at the expiration of his fifty-year sentence for second-degree murder.

On this appeal, defendant candidly acknowledged his failure to enter timely objections. However, after the trial, defendant filed a motion for appropriate relief which was properly denied on the grounds that, because it was asserted more than ten days after entry of judgment, jurisdiction for such motion was in the appellate division, pursuant to N.C.G.S. § 15A-1418(a). Although there is no indication of record that such motion was filed in this Court, defendant has excepted to entry of judgment on the conviction for first-degree rape and to imposition of a life sentence. We must therefore examine the question of whether defendant's conviction of first-degree rape and the life sentence imposed therefor were properly entered against him.

Count II of the four-count bill of indictment is captioned "Count II: Second Degree Rape 14-27.3, 1122," and the text of Count II charges defendant in accordance with the short-form rape indictment statute, N.C.G.S. § 15-144.1. The body of Count II alleges:

> COUNT II: AND THE JURORS FOR THE STATE UPON THEIR OATH DO FURTHER PRESENT that on or about the 6th and 7th days of June, 1984 in Wayne County Gary Elwood Jones unlawfully, wilfully, and feloniously did ravish, abuse and carnally know Mary Pearl Taper, by force against the victim's will.

It is now well settled that the short-form indictment is sufficient (1) to protect a defendant's right to be advised of the accusations against him and to avoid double jeopardy and (2) to permit the court to enter the appropriate judgment. *State v. Sills*, 311 N.C. 370, 317 S.E. 2d 379 (1984); *State v. Lowe*, 295 N.C. 596, 247 S.E. 2d 878 (1978). Thus, the indictment was "*sufficient* in law as an indictment for rape in the first degree" and would support a verdict for any lesser-included offense. N.C.G.S. § 15-144.1(a) (1983) (emphasis added). However, whether the fundamental concerns expressed in *Sills* are protected when the *caption* of a short-form indictment specifies an offense less serious than the maximum offense supported by the indictment and the defendant is nevertheless ultimately convicted of the maximum offense is a question not heretofore addressed by this Court.

Defendant acknowledges that this Court held in *State v. Bennett*, 271 N.C. 423, 156 S.E. 2d 725 (1967), that "[t]he caption of an indictment, whether on the front or the back thereof, is not a part of it and the designation therein of the offense sought to be charged can neither enlarge nor diminish the offense charged in the body of the instrument." *Id.* at 425, 156 S.E. 2d at 726 (citations omitted). In *Bennett*, the caption of the indictment alleged the felony of third offense escape, but the body of the indictment, required to contain allegations of facts showing times and places of previous escapes, contained no mention whatsoever of any former escape. This Court held that Bennett could not plead guilty to an offense for which he had not been charged (third offense escape), reversed his felony conviction, and remanded for entry of judgment on the lesser-included misdemeanor.

We might question whether the *Bennett* rule should apply in circumstances where, as here, a statutorily authorized short-form indictment, sufficient to charge first-degree rape and every lesser-included offense, contains a caption listing the offense charged as "second degree rape" followed by a citation to the statutory definition of second-degree rape. However, we need not decide that question here, as we hold that the State made a binding election not to pursue a verdict of guilty of first-degree rape, thereby effectively assenting to an acquittal of the maximum offense arguably charged by the indictment. Without regard to whether the caption of the indictment could operate as an election by the State to abandon prosecution of first-degree rape, the State made this election by unequivocally arraigning the defendant on second-degree rape, by having that charge entered of record in the clerk's minutes of arraignment, and by failing to express the State's intent to pursue a conviction for first-degree rape at any time before the jury was impaneled and jeopardy attached.

In *State v. Hickey*, 317 N.C. 457, 346 S.E. 2d 646 (1986), we reviewed the evolution in this state of the *Miller/Pearce* "State's election" rule and concluded that recent cases have incorrectly applied the principle announced in *State v. Taylor*, 84 N.C. 773 (1881). We stated in *Hickey*:

> We conclude that justice does not require the rule stated in *Miller* and *Pearce*: that a prosecutor's pre-trial announcement of his election to seek conviction only for some of the

offenses charged in the indictment or only for lesser included offenses has the *immediate* effect of an acquittal of the other or greater charges in the indictment. The better rule which we now adopt for this jurisdiction is that such an announcement by the district attorney at any time prior to trial does not immediately or automatically have the effect of a verdict of acquittal. Instead, such an announced election by the district attorney becomes binding on the State and tantamount to acquittal of charges contained in the indictment but not prosecuted at trial *only* when *jeopardy has attached* as the result of a jury being impaneled and sworn to try the defendant. *See State v. Hunt*, 128 N.C. 584 (431 in the revision), 38 S.E. 473 (1901); *State v. Sorrell*, 98 N.C. 738, 4 S.E. 630 (1887); *see also State v. Shuler*, 293 N.C. 34, 42, 235 S.E. 2d 226, 231 (1977). Until that time the district attorney may withdraw his previously announced election and prosecute the defendant for all crimes charged in the indictment. We emphasize, however, that proper notice of the withdrawal and new election to prosecute must be given the defendant sufficiently in advance of trial to insure the defendant's rights of due process and effective representation of counsel.

*State v. Hickey*, 317 N.C. at 466, 346 S.E. 2d at 652-53.

Applying the *Hickey* rule to the facts of the instant case, we hold that by unequivocally arraigning the defendant on second-degree rape and by failing thereafter to give *any notice whatsoever*, prior to the jury being impaneled and jeopardy attaching, of an intent instead to pursue a conviction for first-degree rape arguably supported by the short-form indictment, the State made a binding election not to pursue the greater degree of the offense, and such election was tantamount to an acquittal of first-degree rape.

In light of the fact that the State made a binding election not to pursue a first-degree rape conviction and thereby effectuated the equivalent of a verdict of not guilty as to that offense, it was clearly error for the trial judge to instruct the jury on first-degree rape, to submit that offense as a possible verdict on the jury verdict sheet, to enter judgment of conviction for first-degree rape, and to impose a life sentence upon that conviction.

In finding the defendant guilty of first-degree rape, the jury necessarily found the existence of all the necessary elements of second-degree rape, a lesser-included offense. *State v. Perry*, 291 N.C. 586, 591, 231 S.E. 2d 262, 266 (1977). For error committed in the trial court resulting in the defendant's conviction of first-degree rape, we vacate the judgment of conviction for that offense and the life sentence imposed therefor and remand the matter for entry of judgment of conviction for second-degree rape and for a resentencing hearing on second-degree rape. This holding renders moot defendant's second assignment of error regarding jury instructions on a new theory of liability for first-degree rape.

## II.

[2] Defendant next assigns as error the admission of testimony by Glenn Odom, Captain of the Investigative Division of the Wayne County Sheriff's Department, as to the consistency of various statements made to him by State's witness David McCullen. Captain Odom testified that in January 1985, he received word from a jailer that David McCullen wished to see him. Odom picked up McCullen from the jail and drove him to the Sheriff's office where McCullen gave Odom a statement, the contents of which Odom did not relate at trial. Odom committed the statement to writing and McCullen signed it. Some two or three days later, Captain Odom conveyed the information contained in the statement to District Attorney Donald Jacobs, and McCullen was subsequently brought to the District Attorney's office where he made a further statement. Following these events, McCullen entered into a plea bargain arrangement and was released from jail on bond.

At trial, only McCullen testified as to the information allegedly contained in the statements he made prior to trial, and the written statements themselves were not introduced. Before McCullen took the stand to testify as to his statements (in which he allegedly recounted defendant's admission to him that defendant and Joseph Leach had committed the crimes for which defendant was on trial), the following exchange took place on direct examination of Captain Odom:

Q. During the time that David McCullen was interviewed in my [District Attorney's] office, did he make any statement —

STRIKE IT—was his statement consistent with the statement that he had made to you?

MR. TAYLOR: Objection.

THE COURT: Overruled. EXCEPTION NO. 12

A. Yes.

Defendant contends that the foregoing constituted an effort to corroborate McCullen's trial testimony in an impermissible manner. Defendant argues that it was within the province of the jury, and not within that of Captain Odom, to determine whether McCullen was consistent in his accounts and that it was the jury which must decide whether Odom's testimony in fact corroborated that of McCullen. 1 Brandis on North Carolina Evidence § 52 (1982).

Defendant refers to the decision of the Court of Appeals in *State v. Norman*, 76 N.C. App. 623, 334 S.E. 2d 247, *disc. rev. denied*, 315 N.C. 188, 337 S.E. 2d 863 (1985), in which an undercover law enforcement officer had been allowed to testify at trial that a witness' post-arrest, pretrial statements to him were consistent with the witness' trial testimony. In *Norman*, the Court of Appeals stated:

[The officer] was not asked to relate to the jury what [the witness] had said to him, only to give his opinion as to whether whatever was said by [the witness] before trial was "essentially what he testified to." In our opinion, this carries the liberality of the consistent statement rule too far. At the least, [the officer] should have been put to the test of recalling for the jury what [the witness] had told him before trial before giving his opinion as to whether [the witness] had been consistent in his pre-trial statements and trial testimony.

*Id.* at 627, 334 S.E. 2d at 250.

The defendant contends that the context of the officer's testimony in *Norman* is "indistinguishable" from that in the instant case. We do not agree, even assuming, *arguendo*, that the Court of Appeals was correct in finding reversible error in *Norman*. First, the officer in *Norman* testified to the effect that his conversations with the witness *before trial* were consistent with

the witness' *trial testimony*. In the instant case, Captain Odom was questioned regarding his opinion as to the consistency, *inter se*, of McCullen's several *pretrial* statements. McCullen had not yet testified at trial.

Second, in *Norman*, upon objection by defense counsel to the prosecutor's question, the trial judge gave a limiting instruction on corroboration of the witness' trial testimony. The Court of Appeals' brief discussion in *Norman* appears to assume, correctly it seems, that the prosecutor's question, "And he told you during those conversations essentially what he testified to here today?" was intended to, and did in fact, elicit an affirmative response tending to bolster the credibility of the witness' earlier trial testimony via corroboration by evidence that the witness had made prior consistent statements.

The context in which the challenged testimony was given in the instant case convinces us that the prosecutor's question was not posed for the purpose of corroboration. The line of questioning preceding Odom's response regarding the consistency of McCullen's pretrial statements disclosed the fact that, after McCullen had made these statements, he entered into a plea bargain arrangement with the District Attorney's office. Much was subsequently made by the defendant of the fact that McCullen's alleged pretrial statements were made at a time when he was incarcerated pending disposition of numerous criminal offenses with which he was charged and that, after McCullen made these statements, he was released on bond but shortly thereafter was arrested on new charges of the same nature. Nonetheless, pursuant to his plea agreement, and presumably in exchange for his testimony in the instant case, McCullen received a sentence substantially less severe than the maximum sentence to which a conviction of all the alleged offenses would have exposed him.

The purpose for which the prosecutor questioned Captain Odom regarding the consistency of McCullen's pretrial statements appears, from the context in which the question was asked, to have been to demonstrate to the jury the reasonableness, at the time, of the State's concessions in entering into a plea agreement in McCullen's cases. The prosecutor obviously anticipated defendant's frontal attack on McCullen's credibility as well as on his and the State's motivation for engaging in plea bargain negotiations

in McCullen's cases in exchange for State's evidence in the instant case. The investigating officer's opinion as to the reliability of McCullen's various pretrial statements, as evidenced by their consistency over time, is certainly relevant in the State's understandable effort to demonstrate the reasonableness of its agreement with him in order to procure valuable, reliable testimony in its prosecution of the defendant in this case.

Therefore, because the challenged testimony was offered, not as corroboration of McCullen's forthcoming trial testimony, but rather by way of explanation of the State's grounds for relying on McCullen's statements in entering plea bargain arrangements with him, a matter entirely collateral to the issue of the defendant's guilt, we find no merit in this assignment of error.

### III.

In his next assignment of error, defendant challenges certain portions of the prosecutor's closing argument which he contends amounted to a violation of his right to a fair trial. Defendant had argued at trial that State's witness Decarol Swinson was a "scorned woman," inferring that her fury provided a motivation for fabrication of her testimony to the effect that defendant had confessed to her that he had robbed and strangled Mary Taper. In response to this theory, the prosecutor pointed out that Ms. Swinson continued to profess her love for the defendant even after she had allegedly learned of his involvement in the crimes. The prosecutor then argued to the jury:

> [I]t was argued to you and I heard it that certainly that's not the type of individual you would want to marry if you know they killed somebody. Well, that may be so for you, but that certainly wasn't so for that lady that wanted to marry Briley in Virginia right before his execution and did in fact and she was from North Carolina.

Although not a part of the record, defendant explains for this Court on appeal that "[t]he reference, of course, was to a matter entirely unsupported by any evidence in the case—the controversial case of James Briley, a Virginia death row inmate who was executed on April 18, 1985. Briley figured prominently in the news in the month and one-half preceding this defendant's trial. His intentions to marry a North Carolina woman . . . were widely publicized in late March 1985."

The defendant lodged no objection at trial to this brief reference to the Briley matter, yet he now contends that the reference "added substantial prejudice to the case."

Another of defendant's theories at trial was that Ms. Swinson's version of the events contained "nothing but simple information anyone could have fabricated." He points out in particular that her pretrial "version" made no reference to an accomplice or to any sexual attack. Although he did not object at trial, defendant assigns as error the failure of the trial judge to intervene *ex mero motu* when the prosecutor argued to the jury:

> [D]oes it stand to reason that Decarol would not know about the sex and you can say, well, Mr. Jacobs, that doesn't mean anything. Well, if she fabricated, *you knew that she knows when she gave her statement in October that there was evidence that the woman had been sexually assaulted* and she has never volunteered that information, which would be a fact that you would look at to determine, well, maybe she did hear what she says she heard because *if she was fabricating and wanting to do the will of her mother, then she would try to pile on or she might try to pile on every harmful fact she could think of and you know and I know she knew the fact that she was sexually assaulted. Some of you knew it before you came or knew something of the case before you came to the court, heard about it, read about it. She had that much interest in Gary you know that she probably had that information too* . . . .

(Emphasis added by the defendant.)

[3] Ordinarily, objection to the prosecutor's jury argument must be made prior to the verdict in order for the alleged impropriety to be reversible on appeal. *State v. Brock*, 305 N.C. 532, 290 S.E. 2d 566 (1982); *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982); *State v. Smith*, 294 N.C. 365, 241 S.E. 2d 674 (1978). Failure to lodge an objection constitutes a waiver of the alleged error. *State v. Brock*, 305 N.C. 532, 290 S.E. 2d 566.

We have said that because of the severity of the sentence in a death case, we will review alleged improprieties in the prosecutor's jury argument in a capital case despite the defendant's failure to enter a timely objection. *E.g., State v. Brock*, 305 N.C. 532,

290 S.E. 2d 566; *State v. King,* 299 N.C. 707, 264 S.E. 2d 40 (1980); *State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Smith,* 294 N.C. 365, 241 S.E. 2d 674; *State v. McKenna,* 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated,* 429 U.S. 912, 50 L.Ed. 2d 278 (1976); *State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222, *death sentence vacated,* 429 U.S. 809, 50 L.Ed. 2d 69 (1976); *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664 (1953). These cases establish that in capital cases, we may review the prosecutor's argument to determine whether the argument was so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu* to correct the error.

Other cases, however, appear to support the position that appellate review of a prosecutor's argument for gross impropriety is not limited to capital cases, but may be invoked in noncapital cases as well. *See, e.g., State v. Mason,* 317 N.C. 283, 345 S.E. 2d 195 (1986); *State v. Mason,* 315 N.C. 724, 340 S.E. 2d 430 (1986); *State v. Harris,* 308 N.C. 159, 301 S.E. 2d 91 (1983); *State v. Williams,* 295 N.C. 655, 249 S.E. 2d 709 (1978); *State v. Woods,* 56 N.C. App. 193, 287 S.E. 2d 431, *cert. denied,* 305 N.C. 592, 292 S.E. 2d 13 (1982).

We hold that appellate review of a prosecutor's argument for *gross* impropriety in absence of an objection at trial is not limited to capital cases, but may be invoked as well in noncapital cases.

[4] The law regarding the scope of counsel's jury arguments has been stated as follows:

"We have consistently held that counsel must be allowed wide latitude in the argument of hotly contested cases. He may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his side of the case. Whether counsel abuses this privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury. Even so, counsel may not employ his argument as a device to place before the jury incompetent and prejudicial matter by expressing his own knowledge, beliefs and opinions not supported by the evidence[.] It is the duty of the trial judge, upon objection, to censor remarks not

warranted by the evidence of the law and, in cases of gross impropriety, the court may properly intervene, *ex mero motu*." (Citations omitted.)

*State v. Williams*, 314 N.C. 337, 358, 333 S.E. 2d 708, 722 (1985) (quoting *State v. Covington*, 290 N.C. 313, 327-28, 226 S.E. 2d 629, 640 (1976) ).

We agree that the prosecutor's reference to the Briley matter, which was not part of the evidence in this case and was a highly sensational, contemporaneous event, and the indirect reference to media coverage were inappropriate. However, we do not find that these references "so exceeded the bounds of permissible argument" or amounted to such gross impropriety as to require the trial court to intervene *ex mero motu* and instruct the jury to ignore the prosecutor's comments. *See State v. Williams*, 314 N.C. 337, 358, 333 S.E. 2d 708, 722. This assignment of error is therefore overruled.

## IV.

[5] By his final assignment of error, defendant contends that he "is entitled to a new trial because the constitution prohibits a death qualified jury to pass on the defendant's guilt or innocence." For reasons set forth in *State v. Barts*, 316 N.C. 666, 343 S.E. 2d 828 (1986), this assignment of error is without merit.

The judgment of defendant's conviction for first-degree rape, and the life sentence entered thereon, is vacated. The case is remanded to the Superior Court, Wayne County, for entry of judgment of conviction for second-degree rape and for appropriate resentencing. We find no other error.

Vacated and remanded in part.