STATE OF NORTH CAROLINA v. GREGORY FLINT TAYLOR

No. 482A93

(Filed 9 September 1994)

## 1. Homicide § 230 (NCI4th)— noncapital first-degree murder—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss a first-degree murder charge for insufficient evidence that defendant was the perpetrator of the offense where the evidence would permit the jury to find that the defendant took Johnny Beck and the victim in his Pathfinder to a cul-de-sac; the jury could reasonably infer that these three individuals smoked cocaine there from defendant's statement and the dry matches and plastic bags found in the cul-de-sac; the evidence tended to show that defendant became upset when the victim refused to have sex and that he hit her; the jury could reasonably infer from the evidence that the defendant was out of the Pathfinder and participating when the blows, stabs, and cuts were inflicted on the victim; and the jury could reasonably infer that two assailants attacked the victim at the same time and that the defendant was one of the assailants from evidence tending to show that two weapons were involved and that wounds were inflicted by different weapons on opposite sides of the victim's body.

**Am Jur 2d, Homicide §§ 425 et seq.**

## 2. Homicide § 244 (NCI4th)— first-degree murder—premeditation and deliberation—sufficiency of evidence

There was sufficient evidence in a noncapital first-degree murder prosecution where premeditation and deliberation could be inferred from the number of wounds and the brutal manner in which they were inflicted, as well as from defendant's attempt to cover up his actions in his statements to the police.

**Am Jur 2d, Homicide §§ 437 et seq.**

## 3. Criminal Law § 794 (NCI4th)— noncapital first-degree murder—instructions—acting in concert

There was sufficient evidence to support the trial court's instructions on acting in concert in a noncapital prosecution for first-degree murder where the evidence in the case would support a reasonable finding that the defendant was present and acting in

concert with Johnny Beck as they picked up the victim to "party" with them and that the defendant and Beck formed a common purpose to murder Thomas after she had "partied" for some time at the defendant's expense and would not proceed with bargained-for sex acts.

**Am Jur 2d, Trial §§ 1255, 1256.**

4. **Evidence and Witnesses § 1912 (NCI4th)— noncapital first-degree murder—bloodhound's actions—admissible**

There was no error in a noncapital first-degree murder prosecution in the admission of evidence of a bloodhound's actions in tracking the victim where defendant contended that the testimony failed the test for admissibility in *State v. McLeod*, 196 N.C. 542, as to the bloodhound's pedigree, training, reliability, and the way in which she was keyed to the scent.

**Am Jur 2d, Evidence §§ 575, 576.**

**Evidence of trailing by dogs in criminal cases. 18 ALR3d 1221.**

5. **Criminal Law § 427 (NCI4th)— noncapital first-degree murder—prosecutor's closing arguments—defendant's failure to testify**

There was no plain error in a noncapital first-degree murder prosecution where the prosecutor stated in his closing argument that "Generally in a homicide, there's two kinds of parties there, the victim who can't say anything, and the perpetrator, who won't say anything" and later said, when arguing that there was no logical explanation as to why the defendant's vehicle was found near a ravine, "The defendant has got to explain something to you. But what he has explained is absurd." The first comment did not mention the defendant or his failure to testify; the prosecutor was simply contending that the absence of eyewitness testimony is common in homicide cases and merely stated that the frequent lack of eyewitness testimony was one of the reasons for the recognition of the legal theory of acting in concert. The second portion of the argument merely attacked the story the defendant had given authorities. Taken in context, this portion of the prosecutor's argument was a comment on the lack of credibility of the defendant's statements to the police and the defendant's failure to produce evidence to corroborate or explain those statements. Moreover, the prosecutor argued to the jury for one and one-half

hours; the two brief portions of that argument complained of by defendant did not, taken in context, encourage the jury to infer guilt from the defendant's silence and did not amount to gross impropriety.

**Am Jur 2d, Trial §§ 577 et seq.**

**Violation of federal constitutional rule (*Griffin v. California*) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

6. **Constitutional Law § 161 (NCI4th); Criminal Law § 47 (NCI4th)— noncapital first-degree murder—defendant convicted, charges against accomplice dismissed—no violation of due process and equal protection**

Defendant's argument that dismissal of murder charges against an accomplice required that his conviction be vacated on due process and equal protection grounds was rejected.

**Am Jur 2d, Criminal Law §§ 166, 167, 632 et seq., 831 et seq.; Constitutional Law §§ 735 et seq.**

Appeal of right by the defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered on 4 April 1993, by Allen (J.B., Jr.), J., in the Superior Court, Wake County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court on 9 May 1994.

*Michael F. Easley, Attorney General, by Francis W. Crawley, Special Deputy Attorney General, and James P. Longest, Jr., Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant, Gregory Flint Taylor, was tried upon proper indictments charging him with first-degree murder and with accessory after the fact to the felony of murder. The defendant was tried non-capitally at the 12 April 1993 Mixed Session of Superior Court, Wake County. The jury found the defendant guilty of first-degree murder and not guilty of accessory after the fact. The trial court entered judg-

ment on 20 April 1993 sentencing the defendant to the mandatory sentence of life imprisonment. The defendant appeals to this Court as a matter of right. *See* N.C.G.S. § 7A-27(a) (1989).

The State's evidence tended to show the following. Officer Brad Kenan drove to a cul-de-sac at the south end of Blount Street in Raleigh on the morning of 26 September 1991. Beyond the cul-de-sac the land slopes up to a crest covered with weeds and grass and then slopes down into a ravine and a creek and to woods beyond. There is a dirt and gravel service road going south from the cul-de-sac. The cul-de-sac is not lighted by street lights and is located many yards south of the closest business.

Officer Kenan arrived at the cul-de-sac around 7:30 a.m. and saw a woman's body lying in the street. The dead woman had short hair and her clothing was in disarray. Her pants were turned inside-out and were down around her ankles. Her shirt was torn open and pulled up to the neck. Officer Kenan observed two holes in the victim's head, several cuts between her breasts and blood on the pavement and caked on the victim's neck. Fingerprint identification later determined that the victim was Jacquetta Thomas. Dry matches and several small blue zip-lock bags in which cocaine and crack cocaine are commonly sold were found in the cul-de-sac near the victim's body. Over the crest of the hill and not visible from the cul-de-sac, a white Nissan Pathfinder truck was stuck in a washed-out gully about one hundred and fifty feet from the body.

Detective Johnny Howard testified that he was at the murder scene in the cul-de-sac when the defendant appeared with his wife and a co-worker at about 8:30 a.m. on 26 September 1991. The defendant told the police that he needed to get the Pathfinder and that he would get out of their way. Detective Howard asked the defendant to go to the police station for questioning, to which the defendant agreed. Detective Howard and another officer questioned the defendant at the police station for over an hour and recorded the questions and answers. The recording and a transcript of the recording were introduced as evidence. The recording was played for the jury.

The defendant said that he left his home in his Pathfinder around 6:00 p.m. on 25 September 1991. He went to a friend's house and stayed until about 9:30 p.m. He then went to another friend's house, drank beer, and became "pretty intoxicated." Around 11:30 p.m., he went to Johnny Beck's house where he smoked cocaine and drank beer. Around 1:00 a.m. on 26 September 1991, he and Beck went to

Beck's brother's house and stayed there until about 2:30 a.m. He and Beck bought some cocaine, then drove into the cul-de-sac, where the victim's body was found. He did not see the victim's body and did not think it was in the cul-de-sac when they arrived. He and Beck saw the service road and decided to go "four-wheeling" in the Pathfinder. They drove down the service road and became stuck in the ravine, where they smoked more cocaine. They then walked up to the cul-de-sac and started walking north on South Blount Street. Beck said that he saw a body in the cul-de-sac. The defendant then turned around and saw something that looked like a body or a roll of carpet. After they had walked further up the street, Beck turned around and said that he saw a person standing in the cul-de-sac. The defendant then looked and saw the person. Beck and the defendant walked to a busier street where they were picked up by a woman who drove them to a "rock" house. They stayed there using drugs until about 6:00 a.m. The woman then drove Beck home and left the defendant at a gas station. The defendant's wife came and picked him up there. The defendant repeatedly said that he did not know the victim, that he had never seen her before and that she had never been in his vehicle.

Eva Kelly testified that she was a prostitute living at 419 East Street in southeast Raleigh on 25 September 1991. On the night of 25 September 1991 and into the early morning hours of 26 September 1991, she saw the defendant driving a Pathfinder with a black male passenger in her neighborhood. In the evening the Pathfinder stopped in front of her house, and she went up to the passenger door and spoke to the black man in the passenger seat. The black man asked if she wanted to get high and party with them. He displayed money and cocaine rocks in his hand. The man had more cocaine in little plastic bags. She declined and the vehicle departed.

Later in the evening Kelly came home with a date. A black female with short hair and "on the hippy side" named Jackie and one named Whoopie were in the kitchen with the same two men in the Pathfinder who had tried to pick her up earlier. Syringes were on the table and the group was smoking crack. Kelly went to another house with her date. Upon returning, she saw Jackie leaving by the kitchen door with Beck and the defendant. She next saw the Pathfinder traveling on Cabarrus Street and recognized it as the one she had seen earlier. She identified the defendant as the man she saw with Jackie in the kitchen and leaving that night in September 1991. She further stated that the defendant was the man she had seen driving the Pathfinder earlier that night.

Ernest Andrews testified that he was in the Wake County Jail awaiting transfer to a state prison when the defendant was placed in the cell with him. While the two men were together in the jail cell they had several conversations. The defendant told Andrews he was charged with murder. Another prisoner asked the defendant how the victim had died. The defendant said that she had died "with a smile on her face." The defendant later added that she was "cut from ear to ear, throat cut."

In a subsequent conversation the defendant explained to Andrews that they were partying, drinking and fondling when the girl got upset and he hit her. She jumped out of his vehicle, and the other man with them jumped out and ran after her. When the other man returned, he said "she wouldn't be partying anymore." The defendant said the other man was black and the victim was a black prostitute.

William E. Hensley of the City-County Bureau of Identification testified that he tested stains on the pavement in the cul-de-sac where the victim's body was found for the presence of blood with positive results. Over the course of the day and night of 26 September 1991, technicians determined that a vehicle had been driven through the pool of blood found beside the body. The vehicle had traveled in a northerly direction and circled around to the southwest before going over the curb and south up the gravel service road. Traces of blood were found on the passenger side front fender, passenger side A-frame and on the passenger side front wheel-well liner of the defendant's Pathfinder. There were no injuries to the victim's arm that would indicate that a vehicle had driven over it.

The victim's left hand lay directly over a bloodstain on the pavement and there was a large defensive cut between two fingers. Bloodstains were observed in an arc on the west side of the body with a radius the length of the left arm. Hensley testified that the arc of bloodstains resulted from the movement of the victim's arm and hand and indicated that she was alive as she lay in the street. Blood from the head and neck wounds had moved in a southerly direction in accord with the slope of the pavement surface.

The trial court conducted a *voir dire* hearing regarding the admissibility of evidence that a purebred bloodhound had indicated that the scent of the murder victim was in, on, or about the defendant's Pathfinder while it was stuck in the ravine approximately one hundred and fifty feet from the victim's body. After entering findings and conclusions, the trial court concluded that the evidence was admissible.

Before the jury, the State's evidence tended to show that Officer Andy Currin took the bloodhound Sadie to the cul-de-sac and prepared a scent directly from the victim's body. After Currin presented the scent to Sadie and commanded her to "find", the bloodhound headed southeast in a "zig-zag" manner to the gravel service road leading away from the cul-de-sac and toward the Pathfinder. Sadie returned to Officer Currin indicating that the scent had stopped prior to or at the bottom of the embankment. Sadie was taken to the top of the ridge, about thirty feet from the Pathfinder and given the command to "find." She worked in a circle searching for the victim's scent. When she was fifteen or twenty feet from the Pathfinder, she went directly to the driver's door and around to the passenger's side door. She jumped on both doors. Officer Currin testified that Sadie's actions indicated the victim's scent was in, on, or around the vehicle.

Dr. Deborah L. Radisch, Associate Chief Medical Examiner, testified that she performed an autopsy on the body of the victim, Jacquetta Thomas, on 27 September 1991 and observed two large tears of the scalp on the right side of the head over a depressed fracture of the skull. Some bone fragments were driven into the brain. Four ribs on the left side were fractured. There were lacerations on the chin and neck. One neck laceration exposed organs in the neck. There was a shallow stab wound on the right shoulder and one over the right breast. In the middle of the chest were three shallow skin cuts that appeared to have been made by a cutting instrument. The cause of death was blunt force injuries to the head and neck. The injuries to the chest and right breast were consistent with a sharp force instrument with a cutting edge, such as a knife. Those injuries were in contrast to the head and neck injuries which were consistent with wounds inflicted by a heavy object with a dull edge. There was no evidence that the victim had been struck by a vehicle. Drug testing revealed a very high concentration of cocaine in the body. The wounds were inflicted while the victim was alive, and the significant amount of bleeding indicated that she had been alive while at the cul-de-sac and had been killed there.

At the close of the State's evidence, and again at the close of all of the evidence, the defendant moved to dismiss the murder charge against him on the ground that there was insufficient evidence that he committed the crime. The trial court denied the defendant's motions.

[1] By his first assignment of error, the defendant contends that the trial court erred in denying his motions to dismiss the murder charge.

The defendant asserts *inter alia* that the evidence was insufficient to support a reasonable finding that he was the perpetrator of the offense. We disagree.

We have stated in detail on numerous occasions the rules to be applied in determining whether evidence introduced at trial will support submission of a charged offense to the jury. *E.g., State v. Vause*, 328 N.C. 231, 236-37, 400 S.E.2d 57, 61 (1991); *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980); *State v. Powell*, 299 N.C. 95, 98-99, 261 S.E.2d 114, 117-18 (1980). When measuring the sufficiency of the evidence to support submission of a charged offense, "all evidence admitted, whether competent or incompetent, must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence and resolving in its favor any contradictions in the evidence." *State v. Williams*, 334 N.C. 440, 447, 434 S.E.2d 588, 592 (1993), *judgment vacated on other grounds,* —— U.S. ——, 128 L. Ed. 2d 42 (1994). A defendant's motion to dismiss "is properly denied if the evidence, when viewed in the above light, is such that a rational trier of fact could find beyond a reasonable doubt the existence of each element of the crime charged." *Id.*

The test of the sufficiency of the evidence to withstand the defendant's motion to dismiss "is the same whether the evidence is direct, circumstantial, or both." *Vause*, 328 N.C. at 237, 400 S.E.2d at 61. "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). The evidence need only permit a reasonable inference of the defendant's guilt of the crime charged in order for that charge to be properly submitted to the jury. *State v. Jones*, 303 N.C. 500, 279 S.E.2d 835 (1981). Once the court determines that a reasonable inference of the defendant's guilt may be drawn from the circumstances, "it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965). Courts making such determinations may resort to circumstantial evidence of motive, opportunity and capability to identify the accused as the perpetrator of the crime. *See State v. Pridgen*, 313 N.C. 80, 95, 326 S.E.2d 618, 628 (1985). "Defendant's evidence rebutting the inference of guilt may be considered only insofar as it explains or clarifies evidence offered by the State or is not inconsistent with the State's evidence." *State v. Lane*, 328 N.C.

STATE v. TAYLOR

[337 N.C. 597 (1994)]

598, 606, 403 S.E.2d 267, 272, *cert. denied,* —— U.S. ——, 116 L. Ed. 2d 261 (1991) (quoting *State v. Furr,* 292 N.C. 711, 715, 235 S.E.2d 193, 196, *cert. denied,* 434 U.S. 924, 54 L. Ed. 2d 281 (1977)).

Applying the foregoing rules to the present case, we conclude that there was sufficient evidence from which a rational trier of fact could find that the defendant killed Jacquetta Thomas. The evidence tended to show that the defendant was present at the cul-de-sac on Blount Street near the time of the death of Jacquetta Thomas. This could reasonably be inferred from the location of the defendant's Pathfinder near the body, the testimony of Eva Kelly that the defendant had been seen with the victim on the night of the killing only a few blocks from the cul-de-sac, and statements made by the defendant to the police and to Ernest Andrews. Evidence of the actions of the bloodhound was sufficient to allow the jury to reasonably infer that the victim had been in or around the defendant's Pathfinder which was found near the victim's body. Additionally, the defendant appeared and attempted to retrieve his Pathfinder from the area of the cul-de-sac at about 8:30 a.m. on 26 September 1991, shortly after the victim's body had been discovered.

From the evidence concerning the location of the body and the location of the patches and pools of blood, the jury could reasonably infer that the victim was slain in the cul-de-sac and left to die by her attacker. Evidence concerning the tire tracks at the scene of the murder tended to show that the defendant's vehicle passed so close to Jacquetta Thomas as to run through a pool of blood next to her body while she lay dying in the cul-de-sac. Such evidence would support a reasonable finding that, contrary to the defendant's statements to the police, Thomas had been attacked and left to die in the cul-de-sac at the time the defendant drove his Pathfinder past her and onto the gravel drive. Furthermore, the traces of blood found on the right front fender, right side A-frame and on the right front wheel-well liner of the defendant's Pathfinder, lent support to the inference that it had made the tire tracks at the murder scene. From the tire track location, the traces of blood on the outer fender and in the wheel-well of the defendant's Pathfinder, and the fact that the Pathfinder was stuck in the gully near the body, the jury could reasonably infer that defendant drove away from the victim's body and became stuck while attempting to flee.

Other evidence tended to show that the victim's wounds were caused by two different implements, one being a heavy blunt force

instrument and the other an instrument with a sharp cutting edge. The evidence tended to show that the wounds consistent with a blunt force instrument were inflicted to a different area of the body than those which were consistent with an instrument with a sharp cutting edge. This evidence would support a reasonable inference that the two implements were wielded by two different assailants, one of whom was the defendant.

The evidence also tended to show that defendant knew before the autopsy had been performed that the victim's throat had been cut. During the original questioning of the defendant by Detective Howard, the defendant looked at a small polaroid photograph of the body and asked, "Was her throat cut?" Testimony of Detective Howard tended to show that the photograph did not reveal any laceration to the throat. There was additional testimony that by looking at the body, one "could not tell there was a hole [in the neck] because the blood had dried on it, was coagulated over it. These wounds were very hard to see."

The evidence tended to show that the defendant also told Ernest Andrews that "she died with a smile on her face" and had been "cut from ear to ear." Given the evidence tending to show the attack took place in a dark cul-de-sac, the jury reasonably could have inferred that the defendant must have inflicted the wound himself or watched as it was inflicted in order to have known how the victim's throat had been cut.

The foregoing evidence would permit the jury to find that the defendant took Johnny Beck and the victim in his Pathfinder to the cul-de-sac at the south end of Blount Street, about ten blocks from the home of Eva Kelly, after 2:30 a.m. on 26 September 1991. From the defendant's statement and the dry matches and plastic bags found in the cul-de-sac, the jury could reasonably infer that these three individuals smoked cocaine there. Evidence tended to show that the defendant became upset when the victim refused to have sex and that he hit her. The jury could reasonably infer from the evidence that the defendant was out of the Pathfinder and participating when the blows, stabs, and cuts were inflicted on Jacquetta Thomas. From evidence tending to show that two weapons were involved and that wounds were inflicted by different weapons on opposite sides of the victim's body, the jury could reasonably infer that two assailants attacked the victim at the same time and that the defendant was one of the assailants.

We conclude that the evidence in this case, taken as a whole and in the light most favorable to the State, was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the defendant killed Jacquetta Thomas. Thus, the defendant's argument to the contrary is without merit. This assignment of error is overruled.

[2] By another assignment of error the defendant contends that his conviction for first-degree murder must be vacated because there was insufficient evidence of premeditation and deliberation to support that conviction. We do not agree.

First-degree murder "is the unlawful killing of another human being with malice and with premeditation and deliberation." *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). "Premeditation" means that the killer "formed the specific intent to kill the victim some period of time, however short, before the actual killing." *Id.* "Deliberation" means "an intent to kill executed by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* Premeditation and deliberation "are not ordinarily subject to proof by direct evidence, but must generally be proved . . . by circumstantial evidence." *State v. Williams*, 308 N.C. 47, 68-69, 301 S.E.2d 335, 349, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). Circumstances tending to prove that the killing was premeditated and deliberate include, but are not limited to:

(1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner.

*Id.* at 69, 301 S.E.2d at 349.

Viewed in the light most favorable to the State, there was sufficient evidence from which a rational trier of fact could find in the present case that the defendant killed the victim after premeditation and deliberation. Premeditation and deliberation properly could be

inferred from the number of wounds and the brutal manner in which they were inflicted, as well as from the defendant's attempt to cover up his actions in his statements to the police. *State v. Hunt*, 330 N.C. 425, 410 S.E.2d 478 (1991). From the vicious assault and from the multiple wounds, many of which must have been inflicted after the victim had been felled and rendered helpless, the jury could reasonably infer that the defendant acted with premeditation and deliberation. *State v. Thomas*, 332 N.C. 544, 423 S.E.2d 75 (1992). We therefore conclude that the evidence in this case was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the defendant, maliciously and after premeditation and deliberation, murdered Jacquetta Thomas. This assignment of error is overruled.

**[3]** By another assignment of error, the defendant contends that he is entitled to a new trial because the trial court erroneously instructed the jury on the theory of acting in concert, which the defendant contends was not supported by the evidence. We disagree.

Under the doctrine of acting in concert, it is not necessary that the defendant do any particular act constituting a part of the crime charged, if he is present at the scene and acting together with another or others pursuant to a common plan or purpose to commit the crime. *State v. Jefferies*, 333 N.C. 501, 512, 428 S.E.2d 150, 155 (1993); *State v. Gonzalez*, 311 N.C. 80, 89, 316 S.E.2d 229, 234 (1984). Taken in the light most favorable to the State on this issue, the evidence in the present case tended to show that two people killed the victim and that one of those people was the defendant. The defendant's statement that the victim's throat had been cut from ear to ear supports a reasonable inference that he was present and participating in the cutting and stabbing of Thomas. The defendant's statement to Andrews in the Wake County Jail attempting to portray Johnny Beck as the lone killer was contradicted by the defendant's detailed knowledge of the victim's mortal wounds prior to being informed about them by the investigators.

Further, evidence tended to show that the defendant was in control of the vehicle, drove it to the cul-de-sac, physically attacked the victim, and was present when the murder occurred. His own statement to Andrews tended to show that he did not protest the murder of the victim, which he attributed to Johnny Beck, but instead admitted that he struck the victim just before she tried to flee from the vehicle. The evidence also tended to show that the victim was still alive when the defendant drove his Pathfinder away from the cul-de-

sac leaving her to die. Such evidence clearly would support a reasonable finding that the defendant and Beck were acting pursuant to a common plan or purpose to ensure that the victim died and to escape detection for her murder.

The evidence in the present case would support a reasonable finding that the defendant was present and acting in concert with Johnny Beck as they picked up the victim to "party" with them. The jury could reasonably find from the evidence presented that the defendant and Beck formed a common purpose to murder Thomas after she had "partied" for some time at the defendant's expense and would not proceed with bargained-for sex acts. Therefore, there was sufficient evidence to support the trial court's instructions on acting in concert. This assignment of error is overruled.

[4] By another assignment of error, the defendant contends that he is entitled to a new trial because the trial court erroneously admitted into evidence Officer Currin's testimony about the bloodhound's actions on 26 September 1991. We disagree.

After *voir dire*, the trial court allowed Currin's testimony. We have held that evidence of bloodhounds' actions is admissible when it is shown:

> (1) that they are of pure blood, and of a stock characterized by acuteness of scent and power of discrimination; (2) that they possess these qualities, and have been accustomed and trained to pursue the human track; (3) that they have been found by experience reliable in such pursuit; (4) and that in the particular case they were put on the trail of the guilty party, which was pursued and followed under such circumstances and in such way as to afford substantial assurance, or permit a reasonable inference, of identification.

*State v. McLeod*, 196 N.C. 542, 545, 146 S.E. 409, 411 (1929). *See also State v. Porter*, 303 N.C. 680, 689, 281 S.E.2d 377, 384 (1981); *State v. Irick*, 291 N.C. 480, 495, 231 S.E.2d 833, 843 (1977); *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1964). The defendant contends that Currin's testimony failed parts 2, 3 and 4 of the *McLeod* test. We disagree.

The defendant first argues that the evidence did not tend to show that the bloodhound Sadie was trained to pursue a trail of human scent and therefore fails part 2 of the *McLeod* test. The defendant claims that no evidence tended to show that Sadie was trained to find

or connect a scent from one object to another or that Sadie had performed this task more than once before. We conclude, however, that the testimony as to Sadie's pedigree and training satisfied part 2 of the test.

Evidence tended to show that at the time of the investigation, Sadie was a three-year-old pedigreed bloodhound. In any event, we have concluded that a dog identified as a bloodhound has "pedigreed himself" if he trails human scent. *Rowland*, 263 N.C. at 359-60, 139 S.E.2d at 665. Prior to the investigation in the present case, Sadie, along with Currin, had attended a canine school in Fayetteville, North Carolina, for two months of bloodhound basic training. They also had attended another canine school in Meriden, Connecticut, for advanced training. There, they were trained to work together to track one specific scent and to discriminate between individual human scents. The final test at the Connecticut school was to track a person by following a one and one-half mile trail of that person's scent that had been left twenty-four hours earlier. Sadie passed this test.

The defendant further argues that the bloodhound Sadie's actions were not "reliable" in this case, and therefore Currin's testimony does not pass part 3 of the *McLeod* test. The defendant argues that Sadie did not follow a scent trail as she had been trained to do at the canine schools. We conclude, however, that evidence tended to show that Sadie was trained to find a trail of human scent which had been broken and that her behavior indicated that she was following such a broken trail of the victim's scent. Sadie had been used by the Raleigh Police Department to find and follow individual human scents well over one hundred and fifty times. *See Irick*, 291 N.C. at 495, 231 S.E.2d at 843 (1976) (holding evidence admissible where dog had trailed human scents approximately twenty-four times and had been trained to do so). She had found articles and trails by their scents in criminal and missing-persons cases. Evidence tended to show that Sadie was a winder, which meant that she detected scents that were transmitted to the air from objects that had been in contact with a specific individual. Currin testified that Sadie could detect a particular scent in the air from any direction within a reasonable area. Evidence tended to show that by jumping up on the windows and circling the Pathfinder before returning to Currin's side, Sadie had indicated that the trail ended in or around the vehicle. This evidence was sufficient to meet the requirements of part 3 of the *McLeod* test.

The defendant also contends that Sadie was not put on the trail of the victim in such a way as to "afford substantial assurance of iden-

tification." Therefore, the defendant says that Currin's testimony fails part 4 of the *McLeod* test. We disagree.

Evidence tended to show that Sadie was keyed to the victim's scent in a way that isolated it and thereby provided "substantial assurance of identification" of that scent, as distinct from any other scents. Currin used a hemostat and gauze to obtain a scent from the victim's body. The gauze was placed in a plastic bag that then was placed around Sadie's nose to "key" her to the scent of the victim's body. After being given a "find" command, Sadie worked the area near the cul-de-sac and discovered the scent trail. She followed the scent until she lost it at the bottom of the embankment. After again being keyed to the scent, she headed straight for the Pathfinder. To insure that the scent was limited to the area where the dog had worked, Sadie was again keyed to the victim's scent away from the vehicle. She found the scent nowhere else in or around the cul-de-sac. *See Irick*, 291 at 496, 231 S.E.2d at 844 (holding evidence admissible even though bloodhound was not first exposed to an article carrying a human's scent before being put on a trail). Such evidence was sufficient to "afford substantial assurance of identification" and satisfied part 4 of the *McLeod* test.

We conclude that each element of the *McLeod* test was met and that the trial court was correct in admitting evidence concerning the bloodhound Sadie's actions. Accordingly, this assignment of error is overruled.

**[5]** By another assignment of error, the defendant contends that the trial court erred by failing to intervene *ex mero motu* during the prosecutor's closing argument to the jury, which he contends included improper comments regarding his decision not to testify. We disagree.

In this case, the prosecutor had explained to the jury that many cases are similar to the present case in that there is no eyewitness to link a defendant to the crime. He stated: "*Generally in a homicide, there's two kinds of parties there, the victim who can't say anything, and the perpetrator, who won't say anything.* That's the reason that the law allows the theory of acting in concert." (Emphasis added). The prosecutor later argued that there was no logical explanation as to why the defendant's vehicle was found near the ravine and stated:

You have to drive over the curb to get up there. This is somebody leaving the scene of this murder in a manner so that they are not seen by folks in the business down here and in a panic, you know,

they have been drinking beer and smoking crack cocaine or injecting it into their arms. That's what this is. That's why that truck is back there. They thought they could got [sic] away that way without taking a chance on having anybody down here see the vehicle leave. That's what we learn from the very fact that the car is there and what it is doing back there. No reason to go back there and smoke crack cocaine. They've accomplished that already at Johnny Beck's brother's house, at the crack house and at this very location without any feeling of any sense of necessity to move. *The defendant has got to explain something to you. But what he has explained is absurd.* He's already accomplished what he tells you is the reason for him moving that vehicle back there.

(Emphasis added).

The defendant chose not to testify in this case. His counsel did not object at any time to the prosecutor's comments that he now challenges. The general rule is that an objection to the prosecutor's jury argument must be made prior to the verdict for the alleged impropriety to be reversible on appeal. *E.g., State v. Williams,* 276 N.C. 703, 174 S.E.2d 503 (1970), *judgment rev'd on other grounds,* 403 U.S. 948, 29 L. Ed. 2d 860 (1971). Failure to object in a timely manner constitutes a waiver of the alleged error. *Id.* We have long held, however, that in capital cases we will review a prosecutor's jury argument, but such review is limited to a review for "gross impropriety." *State v. Green,* 336 N.C. 142, 188, 443 S.E.2d 14, 40 (1994); *State v. Young,* 317 N.C. 396, 415, 346 S.E.2d 626, 637 (1986); *State v. King,* 299 N.C. 707, 713, 264 S.E.2d 40, 44 (1980); *State v. Johnson,* 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979); *State v. Smith,* 294 N.C. 365, 378, 241 S.E.2d 674, 681-82 (1978); *State v. McKenna,* 289 N.C. 668, 686, 224 S.E.2d 537, 549-50, *death sentence vacated,* 429 U.S. 912, 50 L. Ed. 2d 278 (1976); *State v. Alford,* 289 N.C. 372, 384-85, 222 S.E.2d 222, 330, *death sentence vacated,* 429 U.S. 809, 50 L. Ed. 2d 69 (1976); *State v. Dockery,* 238 N.C. 222, 228, 77 S.E.2d 664, 668 (1953).

Additionally, our recent decisions indicate that appellate review for gross impropriety of a prosecutor's argument that was not objected to is not limited to capital cases, but also applies to noncapital cases. *E.g., State v. Jones,* 317 N.C. 487, 500, 346 S.E.2d 657, 664 (1986); *State v. Mason,* 317 N.C. 283, 345 S.E.2d 195 (1986); *State v. Harris,* 308 N.C. 159, 301 S.E.2d 91 (1983); *State v. Williams,* 295 N.C. 655, 249 S.E.2d 709 (1978); *State v. Woods,* 56 N.C. App. 193, 287 S.E.2d 431, *cert. denied,* 305 N.C. 592, 292 S.E.2d 13 (1982). Accord-

ingly, to the extent that cases such as *State v. Brock*, 305 N.C. 532, 290 S.E.2d 566 (1982), and *State v. Williams*, 276 N.C. 703, 174 S.E.2d 503 (1970), may be read as indicating that such appellate review is limited to capital cases, they are no longer authoritative and are disapproved.

As we have indicated, the defendant in the present case never objected to the argument of the prosecutor. We have made it clear that absent such objection, "we will review the prosecutor's argument to determine only whether it was so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu* to correct the error." *State v. Allen*, 323 N.C. 208, 226, 372 S.E.2d 855, 865 (1988), *judgment vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 331 N.C. 746, 417 S.E.2d 227 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 775 (1993).

It is well established that although the defendant's failure to take the stand and deny the charges against him may not be the subject of comment, the defendant's failure to produce exculpatory evidence or to contradict evidence presented by the State may properly be brought to the jury's attention by the State in its closing argument. *State v. Reid*, 334 N.C. 551, 555, 434 S.E.2d 193, 196 (1993); *Young*, 317 N.C. at 415, 346 S.E.2d at 637; *State v. Mason*, 315 N.C. 724, 732, 340 S.E.2d 430, 436 (1986); *State v. Tilley*, 292 N.C. 132, 143, 232 S.E.2d 433, 441 (1977). Our review of the challenged portions of the prosecutor's argument in this case convinces us that they did not amount to an impermissible comment on the defendant's failure to testify. The first comment complained of did not mention the defendant or his failure to testify. The prosecutor was simply contending that the absence of eyewitness testimony is common in homicide cases, as evidenced by his use of the words "[g]enerally in a homicide . . . ." In the next sentence he merely stated that the frequent lack of eyewitness testimony was one of the reasons for the recognition of the legal theory of acting in concert. Thus these comments were not improper.

The second portion of the argument which the defendant contends was improper merely attacked the story the defendant had given to authorities concerning the reason he drove over the curb and out of the cul-de-sac, rather than leaving by the paved road. The prosecutor argued that Beck, the victim and the defendant had been smoking crack cocaine in the cul-de-sac, so the defendant's statement that they left the cul-de-sac and went down the unpaved path to smoke crack did not ring true. The prosecutor contended, based upon competent evidence, that there was:

No reason to go back there and smoke cocaine. They've accomplished that already at Johnny Beck's brother's house. At the crack house and at this very location without . . . feeling any sense of necessity to move. The defendant has got to explain something to you. But what he has explained is absurd. He's already accomplished what he tells you is the reason for moving that vehicle back there.

Taken in context, this portion of the prosecutor's argument was a comment on the lack of credibility of the defendant's statements to the police and the defendant's failure to produce evidence to corroborate or explain those statements. This portion of the prosecutor's argument, therefore, did not amount to gross impropriety, and the trial court did not err by failing to intervene *ex mero motu*. *See State v. Jordan*, 305 N.C. 274, 287 S.E.2d 827 (1982).

Additionally, the record reveals that the prosecutor argued to the jury for one and one-half hours. The two brief portions of that argument complained of by the defendant did not, taken in context, encourage the jury to infer guilt from the defendant's silence. *See State v. Randolph*, 312 N.C. 198, 206, 321 S.E.2d 864, 869-70 (1984). Certainly, they did not amount to gross impropriety requiring the trial court to intervene *ex mero motu*. This assignment of error is without merit and is overruled.

[6] By another assignment of error, the defendant contends that his murder conviction must be vacated "because the simultaneous existence of it and co-defendant Beck's voluntary dismissal violates the law of the land and due process of law" as embodied in Article 1, section 19 of the Constitution of North Carolina and the Fourteenth Amendment to the Constitution of the United States. More than three months after the defendant was convicted for the murder of Jacquetta Thomas, the State dismissed the murder charge it had brought against Johnny Beck for the same murder. The defendant argues, based upon principles of due process and equal protection, that the dismissal of the murder charge against Beck requires that the defendant's conviction for murder now be vacated. The defendant has cited no authority in support of this proposition, and we have found none. We reject this argument. *Cf. State v. Reid*, 335 N.C. 647, 440 S.E.2d 776 (1994) (acquittal of one coprincipal does not bar convictions of the other); *State v. Whitt*, 113 N.C. 716, 18 S.E. 715 (1893) (same). This assignment of error is without merit and is overruled.

For the foregoing reasons, we conclude that the defendant received a fair trial free of prejudicial error.

No error.